Samantha NEELY, George Neely, Carol Neely, Plaintiffs–Appellees,

v.

**RUTHERFORD COUNTY SCHOOL, Defendant–Appellant.**

No. 94–5755.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 12, 1995.

Decided Nov. 2, 1995.

---

Gary D. Buchanan (argued and briefed), Tenn. Protection and Advocacy, Nashville, TN, for plaintiffs-appellees.

Jeffrey L. Reed (argued and briefed), Murfree, Cope, Hudson & Scarlett, Murfreesboro, TN, for defendant-appellant.

Before WELLFORD, MILBURN, and SUHRHEINRICH, Circuit Judges.

WELLFORD, Circuit Judge.

We are called upon here to interpret the scope of the "medical services" exclusion to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401(a)(17).[1] Plaintiff Samantha Neely is a seven year old child who attends school in Rutherford County. Samantha suffers from a medical condition which required that she receive a tracheostomy. As a result of her condition, Samantha must undergo regular suction of throat, nose, and mouth areas in order to avoid serious and, even life threatening, health consequences. George and Carol Neely, Samantha's parents, believe that the IDEA obligates Rutherford County to provide Samantha with suctioning services while she is in school and that Tennessee law requires that those services be provided by a licensed medical professional. The district court agreed with plaintiffs and rejected Rutherford County's contention that such services were "medical services" that Congress specifically excluded under the IDEA. For the reasons stated below, we **REVERSE** the decision of the district court.

## I. *STATEMENT OF FACTS*

There is little dispute concerning many of the facts of this controversy. Samantha Neely suffers from Congenital Central Hypoventilation Syndrome, an extremely rare condition that causes breathing difficulties. Samantha's tracheostomy procedure was necessary to assist her breathing. The procedure creates an opening in the throat, known as a stoma, through which a breathing tube is inserted. This tube must remain in place at all times, but the tube can be dislodged relatively easily if Samantha coughs or even adjusts her clothing. Should the tube become dislodged, Samantha's respiratory functions will cease or become shallow, she will lose consciousness, and she will die if full breathing is not quickly restored.[2]

As a result of the tracheostomy, Samantha is unable to expel throat, mouth, and nose secretions. Consequently, she must regularly suction her breathing passage by mechanical device to ensure that the secretions do not create a blockage; such a blockage would lead to death if not quickly cleared. The number of times Samantha must be suctioned each day varies with the season and with Samantha's health. For instance, when Samantha has a cold, she must be suctioned approximately every twenty minutes; when Samantha is in good health, she may need to be suctioned only after meals.

If Samantha's breathing stops, she may require ventilation with an AMBU bag, which is a device that artificially pumps air into the lungs. If care is not administered within a very few minutes, serious brain damage or death will occur. Samantha is unable to provide her own tracheostomy care. A well-trained individual is required because insertion of the breathing tube can be difficult. The suctioning process must be carefully performed to avoid injury to Samantha and there is little margin for error when resuscitation methods are required. Given the short response time available in emergency situations, the care giver must have sufficient training to avoid panic. Samantha's attendant must devote considerable amounts of his or her attention to Samantha and must be readily accessible to her.

During her first year of school, Samantha's parents alternately attended school with Samantha to provide the care she needs. Due to the illness of another child, however, the

---

1. The IDEA amended the "Education for the Handicapped Act" which Congress originally enacted in 1975. Pub.L. No. 101–476, § 901(a)(1),(3), 104 Stat. 1103, 1141–42 (1990). The IDEA did not amend, however, the substantive provisions which are at issue in this appeal.

2. Samantha is attached to a mechanical ventilator when she is sleeping because Samantha cannot breathe on her own when she is unconscious.

Neelys petitioned the school district to hire a full-time nurse or respiratory care professional to attend to Samantha during the coming school year. Rutherford County initially agreed to employ an attendant with the requisite training and revised Samantha's individualized educational plan ("IEP")[3] accordingly. The school district, however, subsequently hired an individual with only a nursing assistant's certification. The Neelys objected and removed Samantha from school when the care requested was not promptly provided. After a meeting with school officials to determine why it had not hired a respiratory care professional, the parties agreed that Samantha would receive home instruction until the Education Department could determine whether Rutherford County had to hire a nurse to provide in-school, full-time care for Samantha.

Samantha's parents requested a due process hearing before the Tennessee Department of Education. On October 28, 1993, an administrative law judge (ALJ) held a hearing at which the parties submitted testimonial and documentary evidence. The ALJ concluded that the care requested by Samantha was a "medical service" which Rutherford County was not obligated to provide under the IDEA. After the Education Department entered its final order, Samantha and her parents filed suit in federal district court seeking judicial review. The district court held a hearing and provided both parties the opportunity to offer evidence. Neither party submitted any evidence at the hearing, but the Neelys submitted the full administrative record to the district court and supplemented the record with the affidavit of George Neely, Samantha's father. After a review of the evidence, the district court found that the services requested by Samantha were supportive services that the IDEA required Rutherford County to provide. In addition, the district court found that these services were not medical services excluded under the Act. The district court therefore reversed the ALJ's decision and ordered the school dis-

trict to provide the requested care. Rutherford County filed this timely appeal.

## II. STANDARD OF REVIEW

■ Section 1415(e)(2) of the IDEA provides that "[i]n any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines appropriate." 20 U.S.C. § 1415(e)(2). A preponderance finding is indicated in an IDEA action, *Doe ex rel. Doe v. Defendant 1,* 898 F.2d 1186, 1190 (6th Cir. 1990), and the Supreme Court has rejected unrestricted *de novo* review. In *Board of Education of the Hendrick Hudson Central School District v. Rowley ex rel. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690 (1982), the Court stated that the

the provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought. *The fact that § 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings.* And we find nothing in the Act to suggest that merely because Congress was sketchy in establishing substantive requirements, as opposed to procedural requirements for the preparation of an IEP, it intended that the reviewing courts should have a free hand to impose substantive standards of review which cannot be derived from the Act itself.

---

**3.** An IEP is a written program for each handicapped student which is drafted after a meeting between local school officials and parents. 20 U.S.C. § 1401(a)(19). The purpose of the IEP is to provide an evaluation of the child's needs and

to set objective criteria for the school to follow during an academic year. *Id.* Each child's IEP is revised on an annual basis. *Id.* § 1401(a)(18)(E).

*Id.* (emphasis added). In light of *Rowley,* we have interpreted § 1415(e)(2) as calling for "a modified *de novo* review." *E.g., Doe ex rel. Doe v. Board of Educ. of Tullahoma City Schs.,* 9 F.3d 455, 458 (6th Cir.1993); *Thomas v. Cincinnati Bd. of Educ.,* 918 F.2d 618, 624 (6th Cir.1990). This modified standard "requires a *de novo* review but the district court should give due weight to the state administrative proceedings in reaching its decision." *Roncker ex rel. Roncker v. Walter,* 700 F.2d 1058, 1062 (6th Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983). We, therefore, give the ALJ's decision appropriate consideration.

### III. THE REQUIREMENTS OF THE IDEA

▇▇▇ Congress enacted the IDEA as remedial legislation in order to enhance the educational opportunities of handicapped children. *Thomas,* 918 F.2d at 619. The Act's overall objective is to guarantee handicapped children a substantive right to a "free appropriate public education." 20 U.S.C. § 1412(1). The IDEA defines the phrase, free appropriate public education (FAPE), as "special education and related services" that are provided at public expense and supervision, that meet state educational standards, and that conform with the IEP developed for each child. *Id.* § 1401(a)(18). Section 1401(a)(16) defines "special education" as "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a child with a disability, including— (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education." *Id.* § 1401(a)(16)(A),(B). Section 1401(a)(17) states that "related services" include

> transportation, and such developmental, corrective, and *other supportive services* (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counselling, and *medical services, except that such medical services shall be for diagnostic and evaluation purposes only)* as may be required to assist a child

with a disability to benefit from special education.

*Id.* § 1401(a)(17) (emphasis added).

The issue in the case at bar is whether the care requested by Samantha is a "related service" under the IDEA. If the requested care is a related service, the IDEA obligates Rutherford County to provide the service free of charge.

In deciding whether a service is a "related service" under § 1401(a)(17), we must first answer two subsidiary questions. *See Irving Indep. Sch. Dist. v. Tatro,* 468 U.S. 883, 890, 104 S.Ct. 3371, 3375–76, 82 L.Ed.2d 664 (1984). We must initially determine whether the requested service is a " 'supportive service[ ] . . . required to assist a child with a disability to benefit from special education.' " *Id.* (quoting 20 U.S.C. § 1401(a)(17)). If not, then the IDEA imposes no obligation on the school system to provide the service. *Id.* at 894, 104 S.Ct. at 3378 (explaining that if requested service can be performed at some time other than during the school day than it is not a service "necessary to aid a handicapped child to benefit from special education"). If the requested service is a supportive service, then we must also decide whether the service is a "medical service" which is excluded from the requirements of § 1401(a)(17). *Id.* at 890, 104 S.Ct. at 3376.

Rutherford County concedes that the cleaning of Samantha's tracheostomy is a supportive service that is necessary to enable the child to enjoy the benefit of special education. It argues, however, that the requested care is a medical service performed for other than diagnostic and evaluative purposes. The district court acknowledged that "the care requested is clearly medical in nature," but it held that, "[a]bsent evidence that the care requested would be unduly burdensome to the school district, the nursing care *will be deemed* a related, supportive service that falls outside the medical services exclusion."

By its own terms, § 1401(a)(17) would seem to indicate that a school district pay for only those medical services which are performed for diagnostic and evaluation purposes. Thus, one might assume that a school

district is not required under the Act to provide a medical service that is performed for any other purpose.[4] In *Tatro*, however, the Supreme Court did not focus on the purpose for which the service is performed but determined that the application of the medical services exclusion depends on who provides the service and the burdens associated therewith. *Tatro*, 468 U.S. at 892–94, 104 S.Ct. at 3377–78.

*Tatro* involved an eight year old girl who was born with spina bifida, a congenital birth defect. *Id.* at 885, 104 S.Ct. at 3373. The birth defect caused a neurogenic bladder which prevented her from urinating voluntarily. *Id.* As a result, the child had to undergo intermittent catheterizations every three or four hours.[5] *Id.* When the child's school district refused to hire personnel to perform the catheterizations, her parents filed suit, alleging that the requested service was a related service which the school district was obligated to provide. *Id.* at 886, 104 S.Ct. at 3373–74. The Supreme Court found that the catheterization service was a support service which enabled the child to enjoy the benefits of special education. *Id.* at 891, 104 S.Ct. at 3376. The Court then turned its attention to whether the requested service was a medical service excluded under the Act. *Id.* In finding that the catheterization was *not* a medical service, the Court relied heavily on regulations issued by the Department of Education which included "school health services" within the definition of related services. *Id.* at 892, 104 S.Ct. at 3377 (quoting 34 C.F.R. § 300.13(a)). "School health services" were defined, in turn, as " 'services provided by a qualified school nurse or other qualified person.' " *Id.* (quoting 34 C.F.R. § 300.13(b)(10)). The Court also noted that the Secretary of Education defined the term "medical services" as those " 'services provided by a licensed physician.' " *Id.* (quoting 34 C.F.R. § 300.13(b)(4)).

The Court concluded that, when read together, these regulations required the school to provide services which could readily be performed by a school nurse while services performed by a physician were excluded. *Id.* The Court found that the Secretary's interpretation of the statutory language warranted deference, because it was reasonable to believe that Congress included the medical services exception in order to "spare schools from an obligation to provide a service that might well prove unduly expensive and beyond the range of their competence." *Id.* In such a case, *Tatro* pointed out, "[c]hildren with serious medical needs are still entitled to an education ... [since] the Act specifically includes instruction in hospitals and at home within the definition of 'special education.' " *Id.* at 892 n. 11, 104 S.Ct. at 3377 n. 11 (citing 20 U.S.C. § 1401(a)(16)). Because the catheterization could be provided by a school nurse or trained layman, however, the Court held that is was reasonable for the Secretary to conclude "that school nursing services are not the sort of burden that Congress intended to exclude as a 'medical service.' " *Id.* at 893, 104 S.Ct. at 3377.

*Tatro* is subject to several interpretations. It may be read as adopting a bright line rule that any medical service that can be performed by someone other than a licensed physician falls outside the scope of the exception and must be provided by the school. *See, e.g., Macomb County Intermediate Sch. Dist. v. Joshua S.*, 715 F.Supp. 824, 828 (E.D.Mich.1989). The majority of courts, however, have rejected such a *per se* rule. *See, e.g., Granite Sch. Dist. v. Shannon*, 787 F.Supp. 1020, 1027 (D.Utah 1992); *Bevin H. ex rel. Michael H. v. Wright*, 666 F.Supp. 71, 75 (W.D.Pa.1987); *Detsel ex rel. Detsel v. Board of Educ. of Auburn Enlarged City Sch. Dist.*, 637 F.Supp. 1022, 1026–27 (N.D.N.Y.1986). In *Shannon*, the United States District Court for the District of Utah stated that it did not

---

**4.** The Neelys do not contend that the care requested in this case is for diagnostic or evaluation purposes.

**5.** The catheterization procedure required the insertion of a tube into the child's urethra so that urine could be drained from her bladder. *Tatro*,

468 U.S. at 885, 104 S.Ct. at 3373. The Court characterized the procedure as a "simple one that may be performed in a few minutes by a layperson with less than an hour's training." *Id.* The Court even added that the child would soon be able to perform the procedure herself. *Id.*

read *Tatro* to stand for the proposition that *all* health services performed by someone other than a licensed physician are related services under the Act regardless of the amount of care, expense, or burden on the school system and, ultimately, on other school children.

. . . .

... Rather, the Court held only that services which *must* be provided by a licensed physician, other than those which are diagnostic or evaluative, *are* excluded and that school nursing services of a simple nature are not excluded.

*Shannon,* 787 F.Supp. at 1027 (emphasis added). In the instant case, the district court found this rationale persuasive and refused to follow a *per se* rule. Instead, the court concluded that *Tatro* required it to measure the burden on the school district to provide the requested care and to require the school to provide the service if the burden was not excessive.

█ Rutherford County argues that the district court misapplied the *Tatro* rationale by engaging in a balancing of interests analysis *after* it had already determined that the requested care was a medical service. Defendant maintains that the only relevant inquiry is whether the service is medical in nature and, if that question is answered in the affirmative, it is inappropriate for a court to employ any further cost-benefit analysis.

The district court found the service in question to be "medical in nature." We believe the better interpretation of *Tatro* to be that a school district is not required to provide every service which is "medical in nature." The services at issue in *Tatro* could be provided by someone other than a nurse and a layperson, with minimum training, could provide it. *Tatro,* 468 U.S. at 894, 104 S.Ct. at 3378. It was, therefore, the kind of service that was not unduly expensive or beyond the range of the school system's competence. *Id.* at 892, 104 S.Ct. at 3377. We believe it is appropriate to take into account the risk involved and the liability factor of the school district inherent in providing a service of a medical nature such as is involved in this controversy.

## IV. THE BURDEN OF PROVIDING THE REQUESTED SERVICE

Both parties agree that Tennessee law requires that the service requested by Samantha be administered by a physician, registered practical nurse, licensed practical nurse, respiratory care specialist, the patient's relatives or the patient herself. TENN. CODE ANN. §§ 63–6–402, 63–6–410. Thus, the parties also agree that, unlike *Tatro,* Tennessee law would not allow a school nurse to administer the service in question unless the nurse or medical person possessed the requisite licensing and training. The district court estimated that the cost of hiring a licensed practical nurse was not much more than the cost of hiring a certified nurse's assistant. Thus, the district court found that the burden of providing the requested care was not excessive since Rutherford County had initially agreed to hire such an assistant, including upgrading such assistant to the requisite qualification level.

█ Rutherford County contends that the district court's finding is clearly erroneous. It notes that both the ALJ and the district court found that Samantha required almost constant care. A nurse or medical attendant would have had to devote virtually all of his or her attention to Samantha. Rutherford County contends that it is inherently burdensome to hire one medical professional to care for a single child, since the cost cannot be reasonably or feasibly distributed over the entire student population. Since Rutherford County originally intended for the nursing assistant in question to assist many different children, defendant maintains that the district court mistakenly assumed that the added cost of providing Samantha the requested care was insubstantial.

Since we agree that the services requested by Samantha are inherently burdensome, we express no opinion about the financial cost of hiring a licensed practical nurse rather than a nursing assistant. The undue burden in this case derives from the nature of the care involved rather than the salary of the person performing it. We are not persuaded by *Department of Education v. Katherine D. ex rel. Kevin & Roberta D.,* 727 F.2d 809, 815

(9th Cir.1983), a case decided before *Tatro*. The Ninth Circuit held that the Act required a school district to pay for a handicap child's tracheostomy services, since a trained layperson or school nurse was capable of administering the care. *Id.* at 815 n. 6. In several decisions since *Tatro*, however, district courts have held that the Act does not require a school district to provide tracheostomy services, among others, when the handicapped student requires virtually constant care. *E.g., Shannon*, 787 F.Supp. at 1030; *Wright*, 666 F.Supp. at 75; *Detsel ex rel. Detsel*, 637 F.Supp. at 1026–27. In *Shannon*, the district court explained:

> Shannon's reliance on *Tatro* is misplaced. The differences between the level of care required in *Tatro* and the care required by Shannon are significant. The child in *Tatro* did not require constant monitoring. The CIC procedure, which the child would soon be able to perform herself, could be performed by a layperson a few times a day. In contrast, Shannon requires constant care to monitor and clear her tube. The parties have stipulated that the care of at least a licensed practical nurse is required.

*Shannon*, 787 F.Supp. at 1030. In *Wright*, the district court explained that

> [t]he services required are varied and intensive. They must be provided by a nurse, not a layperson. They are time-consuming and expensive. Above all, the life threatening prospect of a mucous plug demands the constant attention of the nurse. Because of this need for constant vigilance, a school nurse or any other qualified person with responsibility for other children within the school could not safely care for Bevin.
>
> It is the "private duty" aspect of Bevin's nursing services which distinguishes this case from.... *Tatro* ... and *Katherine D.* [which] all involved intermittent care which could be provided by the school district at relatively little expense in both time and money.

*Wright*, 666 F.Supp. at 75. Similarly, the district court in *Detsel* noted that

> [t]he Supreme Court considered the extent and the nature of the service performed in

the *Tatro* decision. Unlike CIC, the services required by Melissa are extensive. This is not a simple procedure which the child may perform herself. Constant monitoring is required in order to protect Melissa's very life. The record indicates that the medical attention required by Melissa is beyond the competence of a school nurse.

*Detsel ex rel. Detsel*, 637 F.Supp. at 1026–27.

We find the reasoning of these decisions persuasive, especially *Wright*. As therein explained, it is the "private duty" component of Samantha's care that is inherently burdensome. In *Katherine D.*, the child required suctioning of her tracheostomy two or three times a day and there was no hint that the child faced life threatening consequences in the event the routine care was not administered promptly. Similarly, the child in *Tatro* required catheterization every three or four hours and the Court did not suggest that the child might die if the school nurse was fifteen minutes late. Unlike this case, neither *Tatro* nor *Katherine D.* involved care of a constant nature or of life-threatening consequences to the student. The district court found that Samantha required almost exclusive medical supervision and that such care was necessary in order to protect Samantha's life. Requiring a school to hire a licensed practical nurse to care for one child is "inherently burdensome" and, undoubtedly, distinguishable from *Tatro*.

■ Samantha and her parents argue, however, that the district court was clearly erroneous when it concluded that Samantha required constant care and supervision. Samantha's father submitted an affidavit which indicated that, during the previous school year, he and his wife did not actually remain in the classroom with Samantha but waited in an adjacent room with a pager in the event Samantha required medical attention. The district court rejected this contention noting that:

> [a]lthough Samantha's father avers, in his supplemental affidavit, that it was not the plaintiffs' intention to request exclusive care for Samantha, the evidence presented at the hearing preponderates against any

 

conclusion otherwise. While it is true that a nurse might be able to attend briefly to others in Samantha's room, there is no dispute that Samantha requires constant attention and often one-to-one care. The plaintiffs repeatedly point out in their briefs that Samantha's life-threatening condition requires that Samantha be the attendant's number one priority, and there is no evidence to the contrary.

We believe that the evidence adduced at the administrative hearing was more than sufficient to support the district court's finding. Samantha's father testified that Samantha's breathing tube could be easily dislodged if she coughed, changed her clothing, or even played roughly with other children. He stated that, if the tube was not reinserted within fifteen or twenty minutes, Samantha's carbon dioxide level would rise and she would fall asleep. Once asleep, Samantha would cease breathing and die if respiratory functions were not restored within four or five minutes. Neely also explained that when Samantha had a cold she required suctioning approximately every twenty minutes. When asked how someone could tell when Samantha needed suctioning, he responded as follows:

> I suppose basically you could say you just listen. The sounds that we are listening for is not the same one that you might be. It's just something that you learn or are taught to listen for. Also, I mean, we can tell by her lip color, by her fingernails, just by the way she is acting.

As the district court properly noted, if a nurse attended to the needs of other children, there would be no one present to observe Samantha's behavior, lip and skin color or any of the other tell-tale signs that Samantha required immediate suctioning.

Since the district court did not give its finding of constant care sufficient weight in its determination that the requested care could be provided without undue burden on the school district, we conclude that it was in error. The care requested by Samantha falls within the "medical services" exclusion to the IDEA. Accordingly, we **REVERSE** the de-cision of the district court and **AFFIRM** the ALJ's holding for defendant.