Jeanette and Edward **SKELLY, Jr.,** Individually, and as Parents and Guardians of Eddie Skelly, a minor, Plaintiffs,

v.

**THE BROOKFIELD LAGRANGE PARK SCHOOL DISTRICT 95, Defendants.**

No. 97 C 2782.

United States District Court, N.D. Illinois, Eastern Division.

July 1, 1997.

**386**

Debra S. Davy, David W. Krivit, Peter M. Shannon, Jr., Arnstein & Lehr, Chicago, IL, for plaintiffs.

Alan T. Sraga, Terri Ellen Enler, Andrew Charles Eulass, Scariano, Kula, Ellch & Himes, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

HOLDERMAN, District Judge:

Plaintiffs, Jeanette Skelly and Edward Skelly, Jr., are the parents of Eddie Skelly, a four-year old boy who suffers from a rare neurological-muscular disease know as Pelizaeus–Merzbacher Leukodystrophy (referred to by the parties as "PMD"). As a result of his disease, Eddie is a developmentally delayed, disabled child. He requires a wheelchair, has a gastro-intestinal tube ("G-tube")

and has a tracheostomy tube which was put in place in January 1996. Before the placement of the tracheostomy tube, Eddie suffered from seizures. The tracheostomy tube is not used by Eddie for breathing but is used to keep Eddie's airway clear. Eddie's primary doctor, Dr. James Raettig, described that it is used "for pulmonary toilet." (Dr. Raettig Dep. at 11.) To keep Eddie's tracheostomy tube clear, it is periodically necessary to suction the pulmonary secretions that collect inside the tube. This suctioning is a common tracheostomy tube maintenance procedure and is performed by a person using a small, soft-plastic catheter connector similar to Plaintiffs' Exhibit 5. The connector is attached to a small vacuum-creating suctioning unit that has been provided for Eddie by his family and mounted onto Eddie's wheelchair. Eddie himself cannot operate, at this time, the tracheostomy suctioning equipment on his wheelchair.

Eddie has not been hospitalized since the January 1996 placement of his tracheostomy tube. His tracheostomy tube has stabilized his condition and he lives with his parents and sixteen-year old sister, Jacqueline Skelly, in Brookfield, a Chicago suburb. Eddie's home is located within the boundaries of defendant Brookfield LaGrange Park School District 95 of Cook County, Illinois ("District 95"). All parties agree that Eddie is a child entitled to a "free appropriate public education" within the meaning of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. (the "IDEA").

On April 1, 1997, as a result of Level I and Level II Hearing and Review Officers' administrative decisions and after a multidisciplinary conference, Eddie began daily school attendance at Blair Early Childhood Center ("Blair"), a public school operated by the Chicago Public Schools for students who are physically disabled or medically fragile. Prior to April 1, 1997, Eddie's education was provided at his home by District 95. District 95 has filed an appeal to the Circuit Court of Cook County, Illinois from the Level II decision placing Eddie at Blair. For approximately the first two weeks of Eddie's attendance at Blair, his mother, Jeanette Skelly, accompanied him on the school bus provided

by District 95 during Eddie's daily trips to and from Blair. Because Mrs. Skelly suffers from multiple sclerosis, it is difficult for her to continue this regime. Eddie's father's work schedule as an accountant does not permit him to travel on a regular basis on the bus with Eddie and Eddie's older sister attends high school near the Skelly home so she cannot make the daily trips with Eddie to and from Blair.

On April 21, 1997, plaintiffs brought this civil action in this court pursuant to 20 U.S.C. § 1415(e)(2), *see Dell v. Board of Educ., Township High Sch. Dist. 113*, 32 F.3d 1053, 1055 (7th Cir.1994), as parties aggrieved: (1) by the Level II Review Officer's findings affirming the Level I determination that tracheostomy suctioning is a "medical" service[1] excluded under the IDEA, and (2) by District 95's interpretation of the Level II Review Officer's decision regarding the "transportation services" District 95 is obligated to provide Eddie. More specifically, as to this second point, District 95 contended that any suctioning of Eddie's tracheostomy tube during Eddie's bus rides to and from Blair, if not performed by a member of Eddie's family, had to be performed by a licensed practical nurse and constituted a "medical" service that District 95 was not obligated to provide under the IDEA.

The Level II Review Officer's opinion addressed the second point as follows:

The only question then is whether the care necessary for Eddie's tracheostomy[6] amounts to the provision of a private duty nurse. The evidence suggests that his medical needs at the present time can be met by the school nurses and classroom aides at Blair School.[7] Those needs are not beyond the competence of existing staff. Nor are they unduly expensive since additional nursing personnel would not have to be hired. As the Parents argue, meeting Eddie's needs at Blair School would not entail the provision of excluded "medical" services.[8] Accordingly, the services re-

quired to care for Eddie at Blair, being "supportive" within the regulatory definition and not being excluded, are "related services" for which the District would be responsible if Eddie were placed there.

(Adm. Rec. at 1491–92 (footnotes in original).)

The footnotes accompanying the above text in the Level II Review Officer's opinion are as follows:

[6] The G tube feeding is not a "medical" service. It is not life threatening if not promptly attended. It comes at regularly scheduled intervals and can be accomplished by a school nurse, even at Brook Park.

[7] The District vehemently argues that a "medical" service cannot be magically transformed into a non-medical service simply by moving the child. However, the cases which it has cited suggest differently. If a private duty nurse need not be provided at a more fully staffed location, what was excluded now becomes included. The hiring of a single "one-on-one" nurse not the amount of the expenses makes the service unduly burdensome. Lesser services are not.

[8] Transportation is, by definition, a related service. Its expense is irrelevant to this decision. Moreover, it may be partly reimbursable. Since an aide to accompany Eddie during transportation need not be solely devoted to monitoring him, but could monitor other children at the same time, it is part of the transportation service.

(Adm. Rec. at 1492.)

District 95 has refused, absent a court order, to provide the services of a one-on-one licensed nurse during Eddie's rides to and from Blair arguing that such services are excluded "medical" services under the IDEA. Eddie's primary physician Dr. Raettig testified that the aide who rides the school bus with Eddie does not have to be a one-on-one licensed nurse. District 95 offered the testimony of nurses who were associated with

---

1. On this point, the Level II Review Officer's decision was:

2. "The Level I Hearing Officer did not err in finding that the nursing services identified in the April and May multidisciplinary conferences were excluded 'Medical' services as defined by the Act."

(Adm. Rec. at 1494.)

either District 95 or Blair. There nurses testified to their beliefs that Eddie's tracheostomy tube suctioning, during the bus rides to and from Blair, required the services of a nurse. No physician testified in support of District 95's position. Plaintiffs agree with Dr. Raettig's position and are not asking that the aide who rides the bus with Eddie be a licensed nurse but merely that the aide be a competent adult who has been adequately trained by a member of Eddie's family on how to suction Eddie's tracheostomy tube.

Upon plaintiffs' request, this court entered a temporary restraining order that required District 95 to "provide a competent adult to address any emergency as any adult would for any child to ride the school bus twice a day to and from Blair School with Eddie Skelly." (Apr. 28, 1997 Order, ¶ 2.) The court, thereafter, conducted a multi-day evidentiary hearing as to plaintiffs' request for a preliminary injunction while, with the parties' consent, the temporary restraining order remained in effect. The temporary restraining order also has remained in effect to allow counsel time to file and the court to review post-hearing briefs.

Before the court and ready for decision is plaintiffs' request for relief that District 95 be primarily enjoined from further non-compliance with the IDEA. The singular issue before the court is whether the suctioning of Eddie's tracheostomy tube, when necessary, during the bus rides between Eddie's home and Blair is excluded as a "medical" service from the definition of the term "related services" defined in 20 U.S.C. § 1401(a)(17) which District 95 is statutorily obligated to provide Eddie Skelly under the IDEA.

### FACTUAL FINDINGS

The sources of the facts upon which the court is relying include the administrative record, the evidentiary hearing testimony, the documents introduced at the evidentiary hearing, as well as the videotaped deposition of Dr. James A. Raettig, who has been Eddie Skelly's primary physician since 1994. Not all of the facts in dispute between the parties in this litigation are pertinent to the court's determination of the narrow issue raised by plaintiffs' request for preliminary injunctive relief.

Eddie Skelly was born on April 8, 1993. At approximately the age of one year, Eddie was diagnosed with PMD, a rare neurological-muscular disorder that impairs communication as well as ambulation. In October 1995, Eddie began to experience seizures. In December 1995, Eddie began to use medication to control the seizures. On January 31, 1996, Eddie had a tracheoscopy operation during which a tracheostomy tube was placed in Eddie's upper trachea to serve as a means to assist Eddie in removing mucus and pulmonary secretions to keep his windpipe clear. Eddie does not use the tracheostomy tube to breath. Eddie has had no seizures since mid-February 1996. His condition has stabilized. Because Eddie has difficulty swallowing, he also has a gastro-intestinal tube, referred to as a "G-tube," which allows Eddie's nourishment to by-pass his esophagus and be introduced directly into his gastro-intestinal system. The G-tube feeding takes one to three minutes.

Developmentally, Eddie is delayed but is very interactive, alert, and loves interaction with other people. He is motivated by other children and enjoys being with other children. Educationally and emotionally, Eddie has made remarkable progress during the past few months he has attended Blair.

Eddie's parents, grandmother, sister, aunt, and a family friend provide care for Eddie, including G-tube care and tracheostomy tube care, at his home. None of these people who care for Eddie at his home have had any formal nursing training. Eddie's mother testified that it takes only a matter of minutes to train someone to take care of Eddie's needs. Eddie coughs up most of the pulmonary secretions in his tracheostomy tube himself. His tracheostomy tube suctioning is used mainly as an aid to help Eddie bring up and clear mucus. There are many times when all that is necessary is simply for someone to wipe off the top of the tracheostomy tube. When Eddie is sleeping, he does not need suctioning. When Eddie is active or excited, he needs more frequent suctioning than when he is sedentary.

The type of suctioning of Eddie's tracheostomy tube that Eddie needs during the bus rides to and from Blair is considered surface suctioning. This procedure is performed by inserting into the tracheostomy tube a soft-plastic catheter, a two inch to three and one-half inch tube, that is attached to the catheter connector (Pl.Ex. 5) which is attached to a suctioning unit mounted onto Eddie's wheelchair. When the thumb-sized vent hole of the catheter connector is covered, a suction is created in the soft-plastic catheter and mucus secretions that have collected on the inside wall of Eddie's tracheostomy tube are suctioned. Deep suctioning of Eddie's tracheostomy tube, unlike the suctioning performed with the soft-plastic catheter, is very rare and is performed only when Eddie is sick, in which case he would not be sent to school.

On two occasions prior to his tracheoscopy operation on January 31, 1996, Eddie had a mucus plug, which means that mucus was lodged in his airway and was either too thick or too heavy for Eddie to cough out on his own. Since the placement of his tracheostomy tube, Eddie has suffered no mucus plugs. Eddie has never pulled out the tracheostomy tube, nor has it ever come out as a result of Eddie's activity. Since the placement of his tracheostomy tube in January 1996, Eddie has always been able to cough up his secretions to aid the suctioning of his tracheostomy tube. Eddie has had no respiratory distress since the placement of the tracheostomy tube.

The ability of any person to learn to suction a tracheostomy tube does not require medical licensure. It only requires some training which, as Dr. Raettig testified, would best be provided to the trainee by Eddie's family members. Suctioning of Eddie's tracheostomy tube, especially the type of brief suctioning that Eddie may need during the bus rides to and from Blair, is a maintenance procedure and is not an invasive procedure. Suctioning takes, at most, one or two minutes and does not require any additional equipment beyond the equipment that travels with Eddie on his wheelchair which has been provided by his family. During Eddie's bus ride to and from Blair, Eddie needs a properly trained aide to accompany him, but that aide need not be a Registered Nurse ("RN") or a Licensed Practical Nurse ("LPN"). On occasion during Eddie's rides on the bus, he does not need suctioning. For example, on April 29, 1997, the first day after this court entered the temporary restraining order, when Eddie's mother rode the school bus with District 95's nurse, Mrs. Shirley Ziemmer, Eddie did not require any suctioning. If an emergency ever arose during one of Eddie's bus rides to and from Blair or Eddie needed a doctor, there is an emergency plan in place established by Dr. Raettig. That emergency plan is for paramedics to be called and for Eddie to be taken to Loyola Hospital which is a nearby suburban hospital with which Dr. Raettig is affiliated.

Each school day, once Eddie arrives at Blair he is required to wear a thermal vent or vent cap, similar to Plaintiffs' Exhibit 10, on the outer opening of his tracheostomy tube. This vent cap is used at Blair by all the children who have tracheostomy tubes for hygienic purposes; to avoid their secretions from being transmitted to others if they were to cough so hard that the secretions in their respective tracheostomy tubes were to be expelled out the top of the tube. The vent cap makes it somewhat more difficult for Eddie to clear his pulmonary secretions. This increases the frequency of the suctioning needed to clear the secreted pulmonary mucus from Eddie's tracheostomy tube while he is at Blair but is easily suctioned by the staff at Blair. Eddie does not wear the vent cap during the bus rides to and from Blair.

Currently, Eddie is the only child who uses the bus route that takes Eddie to and from Blair. Eddie's needs during these bus rides do not preclude other children from taking that bus. Eddie does not need one-on-one or private duty nursing care during the bus rides to and from Blair. Any aide assigned to that bus route could be assigned to observe and, if needed, provide care to other children using that bus route.

The bus ride between Eddie's home and Blair takes approximately, on average, twenty minutes but depending on traffic can take up to thirty minutes, Elizabeth Barnes, a

LPN, has been the principal person who has accompanied Eddie on the bus to and from Blair since the entry of the temporary restraining order. Ms. Barnes generally suctions Eddie's tracheostomy tube one to three times during the morning transport, unless Eddie is sleeping, and between three to five times on the way home when Eddie is more active and excited due to his daily school day interaction with the other students and staff at Blair. Ms. Barnes, who appears to be a caring and conscientious person, also sings and plays with Eddie during the bus rides. Ms. Barnes could provide health care services for other children, if these children were on the bus with Eddie.

There are four children at Blair, in addition to Eddie, who have tracheostomy tubes and G—tubes. Two of these children, unlike Eddie, are ventilator dependant. These two children require one-on-one attendants. The other two children at Blair who have tracheostomy tubes and G-tubes and who, like Eddie, are not ventilator dependent do not require one-on-one care at Blair.

During Eddie's approximately two months at Blair, he has had primarily one-on-one nursing service. Ms. Thelma Watson, the school nurse at Blair, believes that Eddie needs one-on-one nursing service during the school day. Dr. Raettig, however, does not believe that Eddie needs one-on-one nursing service at Blair.

### DISCUSSION

#### I. *Federal Statutory and Regulatory Law*

The Individuals with Disabilities Education Act (IDEA), which amended the Education of the Handicapped Act, was enacted in 1990 for the congressional purpose articulated in the IDEA:

> (c) It is the purpose of this chapter to assure that all children with disabilities have available to them, within the time periods specified in section 1412(2)(B) of this title [primarily between the ages of three and eighteen], a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of children with disabilities and their parents or guardians are protected, to as-

sist States and localities to provide for the education of all children with disabilities, and to assess and assure the effectiveness of efforts to educate children with disabilities.

20 U.S.C. § 1400(c).

The statutory definition of "special education" is:

> (16) The term "special education" means specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a child with a disability, including—
>
> (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and
>
> (B) instruction in physical education.

20 U.S.C. § 1401(a)(16).

The statutory definition of the phrase "related services," which is at the core of the dispute between the parties here, is:

> (17) The term "related services" means transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(a)(17).

A "free appropriate public education," the primary concept of the IDEA and its statutory predecessor, is statutorily defined as:

> (18) The term "free appropriate public education" means special education and related services that—
>
> (A) have been provided at public expense, under public supervision and direction, and without charge,

(B) meet the standards of the State educational agency,

(C) include an appropriate preschool, elementary, or secondary school education in the State involved, and

(D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

20 U.S.C. § 1401(a)(18).

Congress in 20 U.S.C. § 1416, specifically authorized the withholding of federal funding by the Secretary of Education for any failure to comply with these laws. Congress conferred federal court jurisdiction to resolve IDEA law suits under 20 U.S.C. § 1415(e). The Secretary of the Department of Education, pursuant to the power conferred in 20 U.S.C. § 1417(b), promulgated various federal regulations that are published in the 34 Code of Federal Regulations, Parts 300–301. Pertinent to the controversy before the court are the following:

> the term "related services" means transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education, and includes speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, early identification and assessment of disabilities in children, counseling services, including rehabilitation counseling, and medical services for diagnostic or evaluation purposes. The term also includes school health services, social work services in schools, and parent counseling and training.

34 C.F.R. § 300.16(a) (1996).

> "Medical services" means services provided by a licensed physician to determine a child's medically related disability that results in the child's need for special education and related services.

34 C.F.R. § 300.16(b)(4) (1996).

> "School health services" means services provided by a qualified school nurse or other qualified person.

34 C.F.R. § 300.16(b)(11) (1996).

In accordance with the standards of appropriate judicial interpretation of statutory and regulatory law, these regulations are to be accorded deference if they are considered reasonable interpretations of congressional intent. *Irving Indep. Sch. Dist. v. Tatro,* 468 U.S. 883, 892, 104 S.Ct. 3371, 3376–77, 82 L.Ed.2d 664 (1984).

## II. *Case Law and Analysis*

The case with which all analysis of the issue presented here should start is *Irving Indep. Sch. Dist. v. Tatro,* 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984), in which the United States Supreme Court held that an eight-year old with spina bifida, Amber Tatro, who required bladder catheterization every three or four hours to avoid kidney injury, was entitled to have the Irving Independent School District provide that catheterization as a "related service" under the IDEA. The Supreme Court determined that the catheterization procedure, though medically prescribed, was not a "medical service" excluded from the School District's statutory obligation. The Supreme Court described the procedure required by Amber Tatro as follows:

> In accordance with accepted medical practice, clean intermittent catheterization (CIC), a procedure involving the insertion of a catheter into the urethra to drain the bladder, has been prescribed. The procedure is a simple one that may be performed in a few minutes by a layperson with less than an hour's training. Amber's parents, babysitter, and teenage brother are all qualified to administer CIC, and Amber soon will be able to perform this procedure herself.

*Id.* at 885, 104 S.Ct. at 3373.

The Supreme Court in *Tatro* interpreted the same statutory and regulatory language at issue here before this court and held:

> The regulations define "related services" for handicapped children to include "school health services," 34 C.F.R. § 300.13(a) (1983), which are defined in turn as "services provided by a qualified school nurse or other qualified person," § 300.13(b)(10). "Medical services" are defined as "services provided by a licensed physician."

§ 300.13(b)(4).[10] Thus, the Secretary has determined that the services of a school nurse otherwise qualifying as a "related service" are not subject to exclusion as a "medical service," but that the services of a physician are excludable as such.

This definition of "medical services" is a reasonable interpretation of congressional intent.

*Id.* at 892, 104 S.Ct. at 3376–77 (footnote in original).

To further explain its holding, the Supreme Court noted in the *Tatro* opinion:

10. The regulations actually define only those "medical services" that are owed to handicapped children: "services provided by a licensed physician to determine a child's medically related handicapping condition which results in the child's need for special education and related services." 34 C.F.R. § 300.13(b)(4) (1983). Presumably this means that "medical services" not owed under the statute are those "services by a licensed physician" that serve other purposes.

*Id.* at 892 n. 10, 104 S.Ct. at 3377 n. 10.

In the *Tatro* opinion, the Supreme Court, *in dicta,* also stated:

Although Congress devoted little discussion to the "medical services" exclusion, the Secretary could reasonably have concluded that it was designed to spare schools from an obligation to provide a service that might well prove unduly expensive and beyond the range of their competence. From this understanding of congressional purpose, the Secretary could reasonably have concluded that Congress intended to impose the obligation to provide school nursing services.

*Id.* at 892–93, 104 S.Ct. at 3376–77 (footnote omitted).

The Seventh Circuit has never addressed the question presented here. Consequently, counsel for the respective parties have advocated this court's adoption of the holdings and analyses of recent opinions from other United States Courts of Appeals. Plaintiffs rely on the Eight Circuit opinion *Cedar Rapids Community Sch., Dist. v. Garret F.,* 106 F.3d 822 (8th Cir.1997) while defendants ar-

gue that the Sixth Circuit's holding in *Neely v. Rutherford County Sch.,* 68 F.3d 965 (6th Cir.1995) is the authority this court should follow.

In *Cedar Rapids Community School District v. Garret F.,* 106 F.3d 822 (8th Cir.1997), the Eighth Circuit affirmed the summary judgment granted by the district court in favor of a child, Garret F., who was quadriplegic and ventilator dependant. The circumstances of Garret's needs were stated in the opinion to be as follows:

During the school day, Garret requires a personal attendant within hearing distance of him at all times to see to his health care needs. Garret requires urinary bladder catheterization about once a day, *suctioning of his tracheostomy as needed,* food and drink on a regular schedule, repositioning, ambu bag administration if the ventilator malfunctions, ventilator setting checks, observation for respiratory distress or autonomic hyperreflexia, blood pressure monitoring, and bowel disimpactation in cases of autonomic hyperreflexia.

*Id.* at 823 (emphasis added).

The Eighth Circuit in following the Supreme Court's lead in *Tatro,* stated:

In *Tatro,* the Supreme Court established a bright-line test: the services of a physician (other than for diagnostic and evaluation purposes) are subject to the medical services exclusion, but services that can be provided in the school setting by a nurse or qualified layperson are not. *See Tatro,* 468 U.S. at 891–95, 104 S.Ct. at 3376–79. Regardless of whether we agree with this reading of the statute and the regulations, we are bound by the Supreme Court's holding.

Here, Garret's services are not provided by a physician, but rather, a nurse. Thus, based on *Tatro,* the services are not medical services, but rather, school health services or supportive services, both of which meet the definition of related services which the district must provide. *See* 34 C.F.R. § 300.16(a),(b)(11) (1996).

*Id.* at 825.

The Eighth Circuit in the *Cedar Rapids* case acknowledged that several judicial deci-

sions did not accept the "bright line" analysis of the *Tatro* opinion. Those are the decisions upon which defendant in this case relies. The Eight Circuit succinctly expressed its reasoning for rejecting these other authorities, stating:

> These courts rely on dicta in *Tatro* in order to factor into the medical services exclusion considerations of the nature and extent of the services performed. The court declines to seize dicta in *Tatro* to go beyond the physician/non-physician test which the Supreme Court sets forth therein.

*Id.*

In the primary case advocated by defendant in this case, *Neely v. Rutherford County Sch.,* 68 F.3d 965 (6th Cir.1995), the facts, as expansively detailed by the Sixth Circuit, are as follows:

> Plaintiff Samantha Neely is a seven year old child who attends school in Rutherford County. Samantha suffers from a medical condition which required that she receive a tracheostomy. As a result of her condition, Samantha must undergo regular suction of throat, nose, and mouth areas in order to avoid serious and, even life threatening, health consequences.

> There is little dispute concerning many of the facts of this controversy. Samantha Neely suffers from Congenital Central Hypoventilation Syndrome, an extremely rare condition that causes breathing difficulties. Samantha's tracheostomy procedure was necessary to assist her breathing. The procedure creates an opening in the throat, known as a stoma, through which a breathing tube is inserted. This tube must remain in place at all times, but the tube can be dislodged relatively easily if Samantha coughs or even adjusts her clothing. Should the tube become dislodged, Samantha's respiratory functions will cease or become shallow, she will lose consciousness, and she will die if full breathing is not quickly restored.

> As a result of the tracheostomy, Samantha is unable to expel throat, mouth, and nose secretions. Consequently, she must regularly suction her breathing passage by mechanical device to ensure that the secretions do not create a blockage; such a blockage would lead to death if not quickly cleared. The number of times Samantha must be suctioned each day varies with the season and with Samantha's health. For instance, when Samantha has a cold, she must be suctioned approximately every twenty minutes; when Samantha is in good health, she may need to be suctioned only after meals.

> If Samantha's breathing stops, she may require ventilation with an AMBU bag, which is a device that artificially pumps air into the lungs. If care is not administered within a very few minutes, serious brain damage or death will occur. Samantha is unable to provide her own tracheostomy care. A well trained individual is required because insertion of the breathing tube can be difficult. The suctioning process must be carefully performed to avoid injury to Samantha and there is little margin for error when resuscitation methods are required. Given the short response time available in emergency situations, the care giver must have sufficient training to avoid panic. Samantha's attendant must devote considerable amounts of his or her attention to Samantha and must be readily accessible to her.

*Id.* at 967.

As can be seen from the Sixth Circuit's recitation of the facts in Neely, the nature and extent of Samantha Neely's needs for immediate tracheostomy suctioning and care appear to be much more critical than Eddie Skelly's while on the bus rides between Eddie's home and Blair. Samantha Neely's tracheostomy procedure was necessary to assist her breathing, Eddie's is not. Samantha needed suctioning about every twenty minutes, Eddie does not, and Samantha's tracheostomy tube could be easily dislodged whereas Eddie's is not.

 It is clear that the burden caused by Samantha Neely's need for care is far greater than Eddie Skelly's and thus that case is distinguishable if this court were to consider burden as a factor in applying the statutory medical services exclusion. This court, however, believes that evaluating the medical

ramifications of such factual differences in the need of children for care should be done by doctors and not judges. As expressed by the Supreme Court in *Tatro,* the Eighth Circuit in *Cedar Rapids,* as well as the Secretary of Education in the Code of Federal Regulations: "medical" services are those services provided by doctors. Services provided by nurses and other health care personnel are "health care" services not excluded from a school district's related services under the IDEA.

This court recognizes the split in the authorities on this issue across the country and acknowledges that other court decisions in addition to *Neely, see e.g. Fulginiti v, Roxbury Township Pub., Sch.,* 921 F.Supp. 1320 (D.N.J.1996); *Granite Sch. Dist. v. Shannon M.,* 787 F.Supp. 1020 (D.Utah 1992); *Detsel v. Board of Educ. of Auburn,* 637 F.Supp. 1022 (N.D.N.Y.1986), *aff'd,* 820 F.2d 587 (2d Cir.), *cert. denied,* 484 U.S. 981, 108 S.Ct. 495, 98 L.Ed.2d 494 (1987), have eschewed the bright-line test recognized in *Tatro* and followed in *Cedar Rapids.* Although the facts in each of these aforecited cases show a greater burden on the respective school district's involved than is shown in the present case and are, therefore, factually distinguishable from Eddie Skelly's circumstance, this court declines to apply the burden test here because this court believes that a bright-line test is not only appropriate legally, but is necessary according to public policy in order to further the efficient and proper use of public funds earmarked for education.

School district boards of education across this country are the elected, primary decision makers for according disabled children the proper educational opportunities under the IDEA. As long as the courts of the country allow the IDEA's application to a particular set of factual circumstances to be determined by a balancing-of-burdens test, litigation that is expensive, both for the parents of children with disabilities who seek relief under the IDEA and for the school districts from which that relief is sought, will flourish. Education funds should be spent on education not litigation. Likewise, courts by their decisions should attempt to quell, not fan, the flame of increasing litigation in this country. Litiga-

tion, such as is before this court, is disruptive to a child's education as well as to the work of the educators and support personnel who provide that education. The most educationally efficient place for educators to spend their profession time (and I am sure the place they would rather be) is the classroom not the courtroom. Yet, without a hard and fast bright-line test that is factually easy for school districts to apply, litigation will continue to be spawned, as in this case in which District 95 appears bent on spending tens of thousands of dollars on litigation to try to save a few hundred dollars on an aide to ride the school bus with Eddie.

If the courts of this country follow the Supreme Court's lead, as they should, and accord the Secretary of Education's public, codified promulgations proper deference, as they should when the regulations are found to be reasonable interpretations of congressional intent, as the Supreme Court held in *Tatro,* then school district boards, professional educators, other school personnel, parents, and the children of this country will know better what is and what is not covered under the IDEA without resorting to litigation on this issue. The courts should assist in the proper administration of the IDEA by providing school districts clear criteria with which to determine compliance with the federal law, consistent with the determination of Congress. The Supreme Court did that in *Tatro* stating:

> Congress plainly required schools to hire various specially trained personnel to help handicapped children, such as "trained occupational therapists, speech therapists, psychologists, social workers and other appropriately trained personnel." S.Rep. No. 94–168, *supra,* at 33, U.S.Code Cong. & Admin. News 1975, p. [1425] 1457. School nurses have long been a part of the educational system, and the Secretary could therefore reasonably conclude that school nursing services are not the sort of burden that Congress intended to exclude as a "medical service." By limiting the "medical service" exclusion to the services of a physician or hospital, both far more

expensive, the Secretary has given a permissible construction to the provision.

*Tatro,* 468 U.S. at 893, 104 S.Ct. at 3377. Proper judicial analysis requires that we, lower courts, end the dilution of the *Tatro* holding and apply the bright line the Supreme Court has provided.

■ The suctioning of a tracheostomy tube is a common, standard maintenance procedure that need not be performed by a physician and therefore is not an excluded "medical" service under 20 U.S.C. § 1401(a)(17), even if a nurse is required to perform the procedure.[2] Consistent with the testimony of both Dr. Raettig and plaintiffs, however, it appears that Eddie's tracheostomy suctioning need not be performed by a licensed nurse but merely a properly trained individual.[3]

### III. *Preliminary Injunctive Relief*

■ As the Seventh Circuit recently articulated:

> In determining whether to enter a preliminary injunction, a district court should consider: whether there is a reasonable likelihood that plaintiff will prevail at trial; whether the plaintiff has an adequate remedy at law or will be irreparably harmed if the injunction is not issued; whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; and whether the granting of the preliminary injunction will deserve the public interest.

*Advent Electronics, Inc. v. Buckman,* 112 F.3d 267, 274 (7th Cir.1997).

### A. *Reasonable Likelihood Plaintiff will Prevail at Trial*

As discussed earlier in this opinion, the federal statutes, regulations, and judicial decision when properly evaluated, demonstrate that plaintiffs' likelihood of success is substantial. Indeed, the undisputed material facts appear to favor plaintiffs' position when measured by a proper analysis of the judicial authority from the Supreme Court in *Tatro* and the Eighth Circuit in *Cedar Rapids.* Allowing the courts, whether it be in conjunction with an appeal from an administrative decision or, as here, a separate civil action by aggrieved parties, to factually reweigh the balance of burdens to be allocated between the public and the parents of children with disabilities is neither what Congress said nor intended in the IDEA. But even applying the judicially-created gloss regarding undue burden, upon which the Sixth Circuit in *Neely,* 68 F.3d at 971–73, expounded, the facts here demonstrate plaintiffs' strong likelihood of success on the merits. Eddie's needs are substantially less burdensome than those of other children with similar disabilities.

### B. *Plaintiffs' Inadequate Legal Remedy and Irreparable Harm*

Eddie's family members for their appropriate, individual reasons cannot themselves fulfill what the court believes is District's 95's statutory obligation of providing Eddie transportation services to and from Blair on a regular basis. If no aide is provided by District 95 to ride the bus with Eddie, he will again be forced into a homebound education

---

**2.** To the extent District 95 argues that the Illinois Nursing Act, 225 ILCS 65/1 et seq., its promulgated regulations, and an Illinois State Board of Education publication, Joint Exhibit 1, require that a licensed nurse provide the evaluative judgment during Eddie's bus rides regarding whether suctioning of Eddie's tracheostomy tube is necessary, the court notes that if tracheostomy tube suctioning was to be considered a "medical" service, District 95 is obligated under 20 U.S.C. § 1401(a)(17) to provide medical services that are "evaluative."

**3.** District 95's argument based on the district judge for New Jersey's cynical view in *Fulginiti v. Roxbury Township Pub. Sch.,* 921 F.Supp. 1320, 1325 (D.N.J.1996), that somehow Eddie's parents and his primary physician are trying to

minimize Eddie's need for care to the point of jeopardizing his health and safety is not only not true, it is completely offensive. Mr. and Mrs. Skelly appear to be loving, caring, and conscientious parents who desire what is best for Eddie. Plaintiffs are happy to accept tracheostomy suctioning performed by any competent, school-provided aide if District 95 believes a nurse is required, plaintiffs will accept that. Plaintiffs, however, do not accept that District 95's beliefs about what the Illinois law requires should somehow transform tracheostomy suctioning from a "health care" service as defined by the Code of Federal Regulations into a "medical" service which District 95 would not under federal law be obligated to provide.

and will suffer irreparably from the lack of educational and social interaction which, but for the absence of the bus ride, is available to him at Blair. Such lost days could not be replaced in Eddie's educational life.

District 95 could have agreed to provide an appropriate aide on Eddie's bus subject to recovering the cost thereof from plaintiffs if defendant prevailed either in its appeal from the Level II decision in the Circuit Court of Cook County or here. District 95 did not so agree. District 95, by refusing to take steps to provide Eddie with a proper aide during transport to and from Blair *without a court order requiring it to do so,* forced this litigation to proceed to this preliminary adjudication of the injunction issues addressed here. Plaintiffs had no other adequate remedy to avoid the irreparable harm they have shown would be suffered.

### C. *Threatened Irreparable Injury to Plaintiffs Outweighs Harm to District 95*

The harm of an injunction to District 95 is not irreparable. Unlike the harm to plaintiffs if an injunction is not entered, any harm to District 95 is easily rectified with money damages. All District 95 need do is continue to provide an appropriate aide to ride the bus with Eddie to and from Blair. It costs District 95 approximately $118 per day for the nurse, to accompany Eddie on the bus to and from Blair. That amount can be repaid to District 95 if the services are determined to be "medical" and not required by the IDEA.

### D. *Serving the Public Interest*

Congress determined, as reflected in the IDEA, that in our country children with disabilities will not be shunted aside in the educational process, but will be provided, at taxpayer expense within specified statutory limits, the same opportunities as all other children. Congress specified the services to be provided and those to be excluded. Congress can change the law if it desires but unless and until it does, congressional enactments such as the IDEA should be enforced by the courts under the law. Congress decided that spreading the economic burden of educating our children, both those with and those without disabilities, furthers the strong public interest in our country of maintaining a democratic society that is knowledgeable and informed. Enforcing the law, especially under the facts before the court, promotes the public interest.

### CONCLUSION

For the reasons stated herein, it is ordered that defendant District 95 is preliminarily enjoined, until the conclusion of a trial on the merits or other order of court, from refusing to provide an aide that with proper training can provide appropriate care to Eddie Skelly, as necessary, during the bus rides between his home and Blair on the days he attends school at Blair. The case is set for report on status on July 8, 1997 at 10:00 a.m. at which time the parties should be prepared to discuss the necessity and amount of an appropriate bond.