**FULGINITI, et als.**

v.

**ROXBURY TOWNSHIP PUBLIC SCHOOLS, et als.**

Civ. No. 94–1025 (WHW).

United States District Court,
D. New Jersey.

April 17, 1996.

Penelope A. Boyd, Public Interest Law Center of Philadelphia, Philadelphia, PA, for Plaintiffs, Carissa Fulginiti, et als.

David B. Rand, Deborah A. White, Rand, Algier, Tosti & Woodruff, Morristown, NJ, for Defendants, Roxbury Township Public Schools, et als.

## OPINION

WALLS, District Judge.

The parties have submitted cross-motions for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. This case concerns the outer parameters of a local School Board's obligation under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et. seq.* ("the IDEA"), to provide a free public education and related services to one of its young, severely-handicapped citizens. For reasons stated below, summary judgment is granted in favor of the defendant, Roxbury Township Public Schools ("the Board").

## Background

Carissa Fulginiti ("Carissa") was born March 26, 1988 to Sam and Judith Fulginiti of Landing, New Jersey, which is located within the Roxbury Township Public School District. The Fulginiti family consists of Carissa, her parents, older sister and younger brother. She was born with severe multiple disabilities which limit her abilities to communicate, swallow and move. She has severe dysfunctions of her central nervous system. At the age of one month, because Carissa could not suck or swallow without choking or aspirating, she was given a tracheostomy, which is a permanent opening into her windpipe. Additionally, a feeding tube was inserted directly into her stomach which allows her to "eat" through a surgically implanted "button."

Carissa requires constant monitoring because her tracheostomy tube and air passages can become clogged with saliva and mucus. When necessary, a suctioning device is used to clear such blockages. The tube is suctioned either with a bulb syringe or a special "deep suctioning" device. If the clogged tube is not promptly cleared, Carissa's life can be threatened. Carissa's parents, who are not doctors or medical care providers, have been taught to perform the monitoring and suctioning procedures. She additionally receives these services from practical nurses whose care she receives for 16 hours per day, pursuant to her eligibility for participation in the federally-funded Medical Assistance Program through a Model III

Medicaid waiver. 42 U.S.C. § 1396a. The Fulginitis assert that without this assistance, Carissa would have to be placed in an institution because they cannot provide the around-the-clock supervision she requires.

Carissa lives at home with her parents and siblings. The 16 hours of Medical Assistance is provided to her when she is not in school in three shifts: (i) 11 p.m. to 7 a.m.; (ii) 7 a.m. to 3 p.m.; and (iii) 3 p.m. to 11 p.m. When Carissa is in school, the Fulginitis must monitor her for the shift from 7 p.m. to 11 p.m. Additionally, the Fulginitis supplement this by caring for Carissa on weekends and holidays and when absent from school due to illness, for the 3 p.m. to 11 p.m. shift.

Since May, 1991, Carissa has been receiving special education and related services, the costs of which have been borne by the Roxbury Township Public Schools. During the 1991–92 academic year, Carissa attended the Warren County Preschool Handicapped class. In 1992–93 and 1993–94 she attended the Children's Center for Therapy and Learning. In 1994–95, she attended the Morris County Regional Day School.

To participate in and benefit from public education, Carissa requires extensive "related services:" she must receive special education and speech, physical and occupational therapy, special transportation and nurse supervision. Most significantly, the supervision of a full-time nurse or another specially trained person is required during her transport to and from school, and while there, to monitor her tracheostomy tube and provide suctioning when necessary. According to the Board, the cost of this nurse is $56,000 per year. Put simply, if Carissa is to attend school, someone must be with her constantly to monitor her air passages and maintain their clarity. The Fulginitis contend that the monitoring and suctioning processes are services related to the provision of the free public education to which Carissa is entitled and which the School Board is obligated to provide.

A child who is entitled to special education receives an Individualized Education Program (IEP) which is developed by a Child Study Team and agreed to by the parents. The IEP developed by the Roxbury Town-

ship Public Schools for Carissa initially included the provision of a full-time nurse to perform the monitoring and suctioning. The Board determined upon further review that such activities fall outside of the scope of the services it must provide. Specifically, the Township concluded that the services were of a medical nature, which it need not provide, rather than "related to education," the provision of which would be obligatory. Indeed, the Township concluded, in a February 4, 1993 letter to the Fulginitis from its Director of Special Services that,

> we have recently been informed by our attorney that new interpretations of federal Medicaid regulations make it Medicaid's responsibility to fund your daughter C.'s nursing care while she is being transported to and from her educational program and during her school day.

Therefore, in July, 1993 the Township proposed an IEP which no longer included payment for a full-time nurse to provide monitoring services during Carissa's day in school.

The Fulginitis, who believe that the Township is required to provide this care, refused to agree to an IEP without tracheostomy tube monitoring and suctioning. They requested a "due process hearing" before an Administrative Law Judge ("ALJ"). The ALJ determined that the care which Carissa requires during the school day is not a "related service" under the Act. The ALJ reached his conclusion through the following analysis.

First, he identified that the case turned on the issue of whether the services sought were related services necessary for a child to benefit from special education and excluded medical services designed for treatment as opposed to diagnosis and evaluation. The ALJ identified the Supreme Court decision in *Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1994), in which the Court held that an 8-year-old girl afflicted with spina bifida was entitled to have the school nurse or other school employee required to administer a simple medical procedure known as "clear intermittent catheterization" so that she could attend school. However, according to the ALJ, the determination of whether services are medical or "related to" is not simply dependent upon the status of the person performing the service. That is to say that services administered by a lay person are not *a fortiori* non-medical. Rather, the ALJ considered the relevant inquiry to be an analysis of the nature and purpose of the service, rather than the identity of the service provider. For this, the ALJ relied upon *Detsel v. Board of Educ.*, 637 F.Supp. 1022 (N.D.N.Y. 1986) *aff'd*, 820 F.2d 587 (2d Cir.), *cert. den.*, 484 U.S. 981, 108 S.Ct. 495, 98 L.Ed.2d 494 (1987), where the appellate court held that the school board was not required to provide services to a student requiring "constant" care that "cannot be adequately provided by a regular school nurse who must care for other children." 820 F.2d at 588.

The ALJ then examined the nature of the services that Carissa required. He found that she needed a person specially trained to: (i) monitor and suction her tracheostomy tube when necessary; (ii) feed her by way of the gastronomy tube; and (iii) understand her attempts at communication without language. The ALJ acknowledged that Carissa's parents, who are lay people, had been trained to perform those functions. However, he noted that parents perform many tasks for their children which, outside the parent-child relationship, would constitute the practice of medicine or involve the functions of a trained nurse. Thus, the ALJ concluded that "one who is to monitor and suction tracheotomy tubes require[s] training similar to that received by nurses."

The ALJ continued to find that Carissa requires 24-hour monitoring because "without clear breathing passages she would not survive." He held that the nurse on duty at Carissa's school could not realistically be assigned the obligation of monitoring and suctioning Carissa's tube because of her responsibilities to the Center's other students. He similarly concluded that the classroom teacher could not be expected to administer these services. The ALJ therefore determined that without constant attention, Carissa would be exposed to a high risk of not being able to breathe. Thus, the nature and purpose of the services required is to maintain Carissa's very existence in order to be physi-

cally capable of receiving an opportunity for an education appropriate to her needs. Thus, he declared the Township

not legally responsible under the Act to provide C.F. with the nurse service sought here. Petitioners must arrange to provide the necessary nurse service for C. in order for her to receive the appropriate education to which she is entitled.

The Fulginitis filed this lawsuit, pursuant to 20 U.S.C. § 1414(e) and 34 C.F.R. § 300.509 (1986), appealing the decision of the ALJ.

At the direction of the Magistrate Judge, the parties submitted additional evidence in the form of certifications and affidavits and submit the present cross-motions for summary judgment. Their positions are summarized as follows:

The Fulginitis claim summary judgment should be granted in their favor under the IDEA because: (i) the ALJ improperly failed to "seriously address the costs and burden to the district of providing the services Carissa needs"; and (ii) the ALJ's denial of payment for the monitoring and suctioning services rendered Carissa's IEP useless, because without those services she cannot attend school. They claim entitlement to judgment under law. The School Board asks the Court to abide the ALJ's determination that although Carissa seeks to compel the provision of medical services, the Board is not legally required to supply them.

### Standard for Summary Judgment

■ Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Building Co. v. Bethlehem Steel*

*Co.,* 533 F.2d 96, 99 (3d Cir.1976), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

### Standard of Review

A district court reviewing a case arising under the IDEA "shall receive the record of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Bd. of Education v. Rowley,* 458 U.S. 176, 205–06, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

### Discussion/Analysis

■ The issue here is whether the Board is required to furnish Carissa Fulginiti with the services of a full-time attendant to monitor her tracheostomy tube and provide suctioning when needed. The answer to that query is no. Those are medical services which the IDEA does not require a local school board to provide.

#### *The IDEA Legal Standard*

The IDEA requires school districts, as a precondition to eligibility for federal funding,

to assure that all handicapped children have available to them ... *a free appropriate public education* which emphasizes special education and related services designed to meet their unique needs, [and] to assure that the rights of handicapped children and their parents or guardians are protected.

20 U.S.C. § 1400(c) (emphasis added). The Township receives federal funding and therefore is subject to the IDEA. The IDEA defines a "free appropriate public education" as

*special education* and *related services* which have been provided at public expense, under public supervision and direction, and without charge, and are provided in conformity with the individualized education program required under the statute.

20 U.S.C. § 1401(18) (emphasis added). "Special education" means,

specially designed instruction at no cost to parents or guardians to meet the unique needs of a child with a disability.

20 U.S.C. § 1401(16). "Related services" include,

transportation, and such developmental, corrective and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, and medical services *except that such medical services shall be for diagnostic and evaluation services only*) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(17) (emphasis added).

Courts have had opportunity to consider challenges to IEPs developed under the IDEA and its predecessor statutes which deal with the issue of whether tracheostomy monitoring falls within the rubric of medical services and, therefore, outside the responsibility of the school board.

In *Granite School District v. Shannon M.*, 787 F.Supp. 1020 (D.Utah 1992), the court considered the plight of a young girl afflicted with congenital neuromuscular atrophy and severe scoliosis who, like Carissa Fulginiti, breathed through a tracheostomy tube and ate through a nasogastric tube. Shannon M., like Carissa, required constant monitoring and occasional suctioning of the tube. Shannon M.'s caretaker also was required on occasion to use an "ambu bag," or portable ventilator, "to open her lungs if her color is bad and she is not getting enough oxygen." (There is no evidence that Carissa requires such service.) The estimated cost to the Granite, Utah School Board of providing a full-time caretaker during the school day was $30,000.

The School Board contended that the requested service fell within the "medical services" exclusion under the IDEA and therefore the costs associated with providing them was not its burden. The court, in a comprehensive opinion, agreed with the School Board. The court basically found that although Shannon M. probably would receive the maximum educational benefit if she could be "mainstreamed" into the regular classroom, such could not be achieved satisfactorily. The Court stated that,

The harsh reality of Shannon's case is that she requires the full-time care of at least a licensed practical nurse because of the constant possibility of a mucous plug in her tracheostomy tube. Such a plug is common, occurring a number of times each day. Without the appropriate care, Shannon's disability becomes life threatening. The record reflects that Granite's three school nurses much serve 75,000 children in more than ninety schools and, therefore, are not reasonably available to provide Shannon with constant care. The cost to Granite of providing Shannon with constant care is estimated at $30,000 a year. The expense of providing Shannon's requested care would undoubtedly take money away from other programs. The court's decision must be tempered by a paramount concern for Shannon's safety and by the Act's principle goal of providing a free public education for all handicapped children.

787 F.Supp. at 1029.

Another district court, however, *Neely v. Rutherford County Schools*, 851 F.Supp. 888 (M.D.Tenn.1994), declined to follow the *Shannon M.* decision. There, Samantha Neely suffered from Congenital Central Hypoventilation Syndrome, which also required her to undergo a tracheostomy. She therefore required the necessary monitoring and suctioning, as well as the occasional use of the "ambu bag" ventilator device that Shannon M. needed. The district Court focused upon the cost of the requested service. It concluded that Samantha could be provided with a full-time attendant for a base salary of between $10,640 and $13,680. The Tennessee court compared this with the approximately $30,000 cost in the Shannon M. case and decided that,

Although the care requested is clearly medical in nature, the costs of this care would not be so burdensome that the ser-

vice should fall within the medical exclusion. The school district currently employs personnel who perform tasks similar to that Samantha's nurse would perform; the costs of that care and the requested care are comparable.... Most importantly, the requested service will allow Samantha to benefit from a plan of special education that all parties agree she seriously needs in a mainstream environment.

851 F.Supp. at 894. The district court held that because the cost of providing the service would not unduly burden the School Board, it fell without the medical services exclusion to the IDEA. On review, that judgment failed to survive the scrutiny of the Sixth Circuit Court of Appeals which determined that the need to provide such constant, trained attention was medical in nature and an "undue burden" upon the school district. *Neely v. Rutherford County School,* 68 F.3d 965 (6th Cir.1995). Identical to the reasoning of the ALJ here, the appellate court explained that "[t]he undue burden in this case derives from the nature of the care involved rather than from the salary of the person performing it." 68 F.3d 965, 972. The judgment of the district court was reversed.

Consequently, the application of the determinative reasoning of all cases which have dealt directly with factual circumstances similar to the present controversy compels the conclusion of the court that to require the present Board to assume the responsibility amounts to an undue burden.

To view this case from a cost analysis as attempted by the *Neely* trial court will not change the result. Here, the school board states that,

> In this case, however, the cost for C.F.'s care is approximately $95,000 per year, *including transportation costs, nursing service costs, and educational costs ...* This cost to the Roxbury School District is excessively burdensome to its school budget and providing such care to C.F. would restrict Roxbury School District from providing other needed services to other handicapped children within the district. (emphasis added).

Admittedly, the $95,000 per year figure includes transportation and tuition costs, nei-

ther of which any party denies that the Board is obligated to provide. Any relevant number here is the annual cost of hiring a full-time person to monitor and suction Carissa's tracheostomy tube. According to the School Board at oral argument, that cost is $56,000 of the overall amount, pursuant to contract with the same service which provides the at-home care to Carissa. By this arrangement, the child has an uninterrupted flow of constant attention throughout the day. Sadly, she requires no less. The Court finds that requiring the Board to assume this responsibility amounts to an undue burden.

Interestingly, the plaintiffs claim that the $56,000 figure given by the Board is unnecessarily high. They would have the Court require the Board to "shop around" in search of a lesser-priced alternative. However, the Fulginitis fail to provide the Court with any evidence of how much it would cost the Township to provide "a more reasonably-compensated" full-time employee to monitor Carissa's tracheostomy tube and provide suctioning. They offer the affidavit of a Dr. Lehr who claims that the Board's estimate of the cost of such services is too high, but she does not give an example of a lesser-priced alternative. This type of proposed "shopping" raises the specter of the following scenario: A less expensive service is provided to the child—an untoward catastrophic event occurs involving the health of the child and the quality of such "cheaper" service—distraught parents may seek to blame-by-suit the Board for unreasonably providing such "cheaper assistance." Other equally negative scenarios can be engendered by this "shopping." The necessity to provide quality "life or death" assistance should not be the object of "bargain-hunting."

Summary judgment in the Township's favor is warranted. The Township has met here its burden of proving by a preponderance of the evidence that the care required for Carissa is medical in nature and that to provide it would be unduly burdensome upon the District. The Fulginitis have attempted to dispute this. At this stage, the Fulginitis have failed to come forward with affirmative evidence that supports their contention that Carissa's care would not unduly burden the

Township; merely disagreeing with the Township's assessment is not enough.

### Conclusion

The Court concludes that the services Carissa Fulginiti requires are medical in nature and therefore outside of the School Board's funding responsibilities. The determination of the ALJ is affirmed. The defendants' motion for summary judgment is GRANTED and that of the plaintiffs is DENIED.

**So Ordered:**

### ORDER

After review of the evidence and for good cause shown, in accordance with its Opinion, the Court rules as follows:

The motion for summary judgment of defendants is **granted.**

The motion for summary judgment of plaintiffs is **denied.**