**MORTON COMMUNITY UNIT SCHOOL DISTRICT NO. 709, Plaintiff,**

**v.**

**J.M. a minor; M.M. and S.M., individually and as parents and next friends of J.M., and the Illinois State Board of Education, Defendants.**

**No. 97–1056.**

United States District Court, C.D. Illinois.

Oct. 23, 1997.

Thomas R. Davis, Michael J. Tibbs, Douglas G. Griffin, Miller Hall & Triggs, Peoria, IL, for Morton Community Unit School District No. 709.

Janet M. Cartwright, Karen Ward, Equip for Equality Inc., Rock Island, IL, for J.M.

Brian J. Dees, Office of Attorney General, Springfield, IL, for Illinois State Board of Education.

## ORDER

McDADE, District Judge.

Before the Court are Defendants' Motion for Preliminary Injunction [Doc. # 14], and cross motions for summary judgment. [Docs. 17 & 22]. For the reasons set forth below, Defendants' Motion for Summary Judgment is GRANTED, Plaintiff's Motion for Summary Judgment is DENIED, and Defendants' Motion for Preliminary Injunction is DENIED as MOOT.

## BRIEF OVERVIEW

On September 23, 1996, a Level I Hearing Officer for the Illinois State Board of Education ordered Plaintiff, the Morton Community Unit School District ("Morton School District"), to identify and contract with a qualified individual in order to provide health related services to Defendant, J.M., a minor. (Administrative Record ("R.") at p. 793–799). On January 23, 1997, a Level II Reviewing Officer for the Illinois State Board of Education affirmed. (R. at p. 1–28). Despite the directive handed down by the Illinois State Board, the Morton School District has refused to provide the services for J.M. (Doc. # 25 at ¶ 37). Rather, in the instant appeal of the administrative decision, Plaintiff argues that the State Board erred and consequently seeks judicial review of the administrative decision pursuant to 20 U.S.C. § 1415(e)(2) of the Individuals With Disabilities Education Act ("IDEA").

## BACKGROUND

J.M. is a 14 year old who suffers from Noonan's Syndrome, chronic fibrotic lung disease, cystic hygroma, and receives treatment for corneal abrasions (hereinafter collectively referred to as J.M.'s "disabilities") (Doc. # 25 at ¶ 1). J.M. uses a portable ventilator system known as an oxygen trach collar to maintain respiratory functioning. (Doc. # 25 at ¶ 17). In addition, J.M. has a tracheostomy and gastrostomy.[1] (Doc. # 18 at ¶ 7; Doc. # 25 at ¶ 18).

Because of his disabilities, J.M. requires a "pediatric nurse" or "trained" individual to monitor him throughout the day. (Doc. # 25 at ¶¶ 13, 14; Doc. # 18 at ¶ 8). During the school day, J.M. requires suctioning of his airways, application of an eye ointment every hour, and monitoring of his portable life support equipment. (Doc. # 25 at ¶ 28). It is undisputed that J.M.'s parents were able to provide the above services after one week of training at a hospital. (Doc. # 25 at ¶ 13; Doc. # 27 at ¶ 13).

The Morton School District describes J.M.'s needs somewhat differently:

> J.M. is ventilator dependent with a tracheostomy, gastrostomy and is dependent in the activities of daily living. J.M. requires either a skilled pediatric nurse or one of his parents with him at all times. J.M. requires a skilled pediatric nurse with him while he attends school. The duties of the skilled pediatric nurse ... would include assessment of J.M.'s respiratory status with appropriate interventions (suctioning, trach care or replacement, oxygen administration, etc.), administration of medication (requires hourly eye lubricant to prevent corneal abrasions), administration of nebulized breathing treatments, monitoring of equipment function with troubleshooting as indicated, and assistance with activities of daily living (feeding, toileting, and transfers).

(Doc. # 18 at ¶¶ 6–10).

J.M. attended Maycrest School in the Lisbon Community Consolidated Grade School District for approximately five years. (Doc. # 25 at ¶¶ 3–6). The Lisbon School District contracted with a nurse, Ms. Faith Read, to provide the health services for J.M. while he attended school. (Doc. # 25 at ¶ 30). Ms. Read was also contracted by the Lisbon District to aid in J.M.'s transportation to and from school. (Doc. # 25 at ¶ 31).

In May of 1996, J.M. and his parents moved to the Morton Community Unit School District when his father was transferred as a result of his employment with Caterpillar Incorporated. (Doc. # 25 at ¶ 2). When J.M. enrolled in school, his parents asked the Morton School District to provide, at its own expense, the services of a trained individual to monitor J.M. during the school day. (Doc. # 23 at p. 2). However, after considering J.M.'s request, the School District determined that it was under no obligation to provide the health services. (Doc. # 18 at ¶ 5). The School District refused to provide the health services not because of the potential financial burden on the District:[2] (Doc. # 25 at ¶ 37), rather, the District has refused because the District believes that it is prohibited from doing so by federal law. (Doc. # 25 at ¶ 37).

In response to the School District's refusal, J.M. sought review of the decision before the Illinois State Board of Education. (Doc. # 19 at p. 1). Two successive administrative hearings were held. (Doc. # 19 at p. 1–2). The issue at both hearings was singular and the same: whether the services required by J.M. to attend school were "related services" within the meaning of the IDEA. (Doc. # 25 at ¶ 43). After finding that the services re-

---

1. A "tracheostomy" is a "[s]urgical creation of an opening into the trachea through the neck, for insertion of a tube to facilitate the passage of air to the lungs, or evacuation of secretions." A "gastrostomy" is a "[s]urgical creation of an artificial gastric fistula." A "fistula" is "[a]n abnormal passage ... usually between two internal organs, or leading from an internal organ to the surface of the body [.]" *See Dorland's Illustrated Medical Dictionary*, 24th Edition (1965).

2. Colleen Harris, the Director of Special Education for Morton, developed cost figures that estimated the cost of contracting with a nurse for J.M. to be $20,000 per school year. (Doc. # 25 at ¶ 35). The Morton School District in 1996 had a total budget of $16.8 million dollars, and an enrollment of 2915 students. (Doc. # 25 at ¶ 38).

quired by J.M. were in fact "related services," the Illinois State Board ordered the School District to identify and contract with a qualified individual to provide the necessary health related services to J.M. while he attends school. (Doc. # 25 at ¶ 42). The School District has refused to provide the health services for J.M. until this Court reviews the administrative decision pursuant to 20 U.S.C. § 1415(e)(2). (Doc. # 1 at p. 1).

### STANDARD OF REVIEW

The standard of judicial review under the IDEA differs from that governing the typical review of a motion for summary judgment. *Heather S. v. State of Wisconsin,* 125 F.3d 1045, 1052 (7th Cir.1997); *Hunger v. Leininger,* 15 F.3d 664, 669 (7th Cir.1994). The IDEA dictates that the district court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). When neither party has requested that the district court hear additional evidence, "there is nothing new presented to the district court; thus '[t]he motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.'" *Heather S.,* 125 F.3d at 1052.

Despite being termed summary judgment, the district court's decision is based on the preponderance of the evidence. 20 U.S.C. § 1415(e)(2); *Hunger,* 15 F.3d at 669. The party challenging the outcome of the state administrative decision bears the burden of proof. *Board of Educ. of Community Consol. Sch. Dist. 21 v. Illinois State Bd. of Educ.,* 938 F.2d 712, 716 (7th Cir. 1991). In reviewing the administrative record, the district court is required to give "due weight" to the results of the administrative proceedings and not "to substitute [its] own notions of sound education policy for those of the school authorities," whose decision it is reviewing. *Heather S.,* 125 F.3d at 1052 (*quoting Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S.

176, 206, 102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690 (1982)).

### LEGAL ANALYSIS

The IDEA requires a school district to provide, at its own expense, "related services" and/or "school health services" to eligible disabled children, however, the Act does not require a school district to expend funds on "medical services" unless the "medical services" are rendered for the purpose of "diagnosis" or "evaluation." *See* 20 U.S.C. § 1401(a)(17). Thus, the issue in the instant action is simple: are the health services that J.M. requires excluded "medical services" or included "related services" within the meaning of the IDEA? The Illinois State Board of Education determined that J.M. required "related services." The Morton School District argues that the State Board erred because J.M. requires "medical services." As the party challenging the outcome of the state administrative decision, the Morton School District bears the burden of proof. *See Heather S.,* 125 F.3d at 1052.

Before considering the arguments raised by the Morton School District, the Court will first set forth the statutory and regulatory framework that governs this action. Because the Seventh Circuit has not addressed the issue raised here, *Skelly v. The Brookfield Lagrange Park School District 95,* 968 F.Supp. 385, 392 (N.D.Ill.1997), the Court will also describe the manner in which other federal courts have resolved similar disputes.

The Individuals with Disabilities Education Act, which amended the Education of the Handicapped Act, was enacted in 1990 for the congressional purpose articulated in the IDEA:

(c) It is the purpose of this chapter to assure that all children with disabilities have available to them, within the time periods specified in section 1412(2)(B) of this title a free appropriate public education which emphasizes *special education* and *related services* designed to meet their unique needs, to assure that the rights of children with disabilities and their parents or guardians are protected, to assist States and localities to provide for the education of all children with disabilities, and to as-

sess and assure the effectiveness of efforts to educate children with disabilities.

20 U.S.C. § 1400(c) (emphasis added). The statutory definition of "special education" is:

(16) The term "special education" means specifically designed instruction, *at no cost to parents* or guardians, to meet the unique needs of a child with a disability, including—

(A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and

(B) instruction in physical education.

20 U.S.C. § 1401(a)(16) (emphasis added). The statutory definition of the phrase "related services," which is at dispute here, is:

(17) The term "related services" means transportation, and such development, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, and *medical services, except that such medical services shall be for diagnostic and evaluation purposes only* ) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(a)(17) (emphasis added).

A "free appropriate public education," the primary concept of the IDEA and its statutory predecessor, is defined as:

(18) The term "free appropriate education" means special education and related services that—

(A) have been provided at public expense, under public supervision and direction, and without charge,

(B) meet the standards of the State educational agency,

(C) include an appropriate preschool, elementary, or secondary school education in the State involved, and

(D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

20 U.S.C. § 1401(a)(18).

■ Congress in 20 U.S.C. § 1416, specifically authorized the withholding of federal funding by the Secretary of Education for any failure to comply with these laws. *See Skelly v. The Brookfield Lagrange Park School District* 95, 968 F.Supp. 385, 391 (N.D.Ill.1997). Congress conferred federal court jurisdiction to resolve IDEA law suits under 20 U.S.C. § 1515(e). *Id.* The Secretary of the Department of Education, pursuant to the power conferred in 20 U.S.C. § 1417(b), promulgated various federal regulations that are published in the 34 Code of Federal Regulations, Parts 300–301. *Id.* In accordance with standards of appropriate judicial interpretation of statutory and regulatory law, these regulations are to be accorded deference if they are considered reasonable interpretations of congressional intent. *See Irving Indep. Sch. Dist. v. Tatro,* 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984).

34 C.F.R. § 300.16(a) provides:

the term "related services" means transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education, and includes speech pathology and audiology, psychological services, physical and occupational therapy, recreation, early identification and assessment of disabilities in children, counseling services, including rehabilitation counseling, and medical services for diagnostic or evaluation purposes. The term also includes school health' services, social work services in schools, and parent counseling and training.

34 C.F.R. § 300.16(b)(4) provides:

*"Medical Services" means services provided by a licensed physician* to determine a child's medically related disability that results in the child's need for special education and related services. (emphasis added)

34 C.F.R. § 300.16(b)(11) provides:

"School health services" means services provided by a qualified school nurse or other qualified person.

In *Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984), the United States Supreme Court considered whether the needs of a handicapped child were "medical services" or "related services" within the meaning of the IDEA. There, an eight-year old with spina bifida, Amber Tatro, required bladder catheterization every three to four hours while she attended school. *Id.* at 885, 104 S.Ct. at 3373. The Court described the procedure required by Amber as follows:

> In accordance with accepted medical practice, clean intermittent catheterization (CIC), a procedure involving the insertion of a catheter into the urethra to drain the bladder, has been prescribed. The procedure is a simple one that may be performed in a few minutes by a layperson with less than an hour's training. Amber's parents, babysitter, and teenage brother are all qualified to administer CIC, and Amber soon will be able to perform this procedure herself.

*Id.* at 885, 104 S.Ct. at 3373.

The Supreme Court held that Amber was entitled to have the Irving Independent School District provide the catheterization as a "related service" under the IDEA. *Id.* at 891–95, 104 S.Ct. at 3376–78. The Supreme Court determined that the catheterization procedure, though medically prescribed, was not a "medical service" excluded from the school district's statutory obligation. *Id.* at 891, 104 S.Ct. at 3376. The Court explained:

> We also agree with the Court of Appeals that provision of CIC is not a "medical servic[e]," which a school is required to provide only for purposes of diagnosis or evaluation. *See* 20 U.S.C. § 1401(17). We begin with the regulations of the Department of Education, which are entitled to deference. [ ] The regulations define "related services" for handicapped children to include "school health services," 34 C.F.R. § 300.13(a) (1983), which are defined in turn as "services provided by a qualified school nurse or other qualified person," § 300.13(b)(10). "Medical services" are defined as "services provided by a licensed physician." § 300.13(b)(4). *Thus, the Secretary has determined that the services of*

> *a school nurse otherwise qualifying as a "related service" are not subject to exclusion as a "medical service," but that the services of a physician are excludable as such. This definition of "medical services" is a reasonable interpretation of congressional intent.*

*Id.* at 892, 104 S.Ct. at 3377. (emphasis added). The Court further explained:

> The regulations actually define only those "medical services" that are owed to handicapped children: "services provided by a licensed physician to determine a child's medically related handicapping condition which results in the child's need for special education and related services." 34 C.F.R. § 300.13(b)(4) (1983). Presumably this means that "medical services" not owed under the statute are those "services by a licensed physician" that serve other purposes.

*Id.* at 892 n. 10, 104 S.Ct. at 3377 n. 10. Finally, in dicta, the Court stated:

> Although Congress devoted little discussion to the "medical services" exclusion, the Secretary could reasonably have concluded that it was designed to spare schools from an obligation to provide a service that might well prove *unduly expensive* and beyond the range of their competence. From this understanding of congressional purpose, the Secretary could reasonably have concluded that Congress intended to impose the obligation to provide school nursing services.

*Id.* at 892–93, 104 S.Ct. at 3377 (emphasis added).

■ In interpreting the *Tatro* decision, some federal courts have held that the Supreme Court developed a bright-line rule that declares that a handicapped child is entitled to health services under the IDEA as long as the services are provided by an individual other than a physician. *See Skelly*, 968 F.Supp. at 394; *see also Cedar Rapids Community School District v. Garret F.*, 106 F.3d 822 (8th Cir.1997).

In *Garret F.*, the defendant, Garret, a minor, was quadriplegic and ventilator dependant. *Id.* at 823. The Eighth Circuit described Garret's needs as follows:

During the School day, Garret requires a personal attendant within hearing distance of him at all times to see to his health care needs. Garret requires urinary bladder catheterization about once a day, suctioning of his tracheostomy as needed, food and drink on a regular schedule, repositioning, ambu bag administration if the ventilator malfunctions, ventilator setting checks, observation for respiratory distress or autonomic hyperreflexia, blood pressure monitoring, and bowel disimpactation in cases of autonomic hyperreflexia.

*Garret F.*, 106 F.3d at 823. In finding that the services that Garret required were "related services" within the meaning of the IDEA, the Eighth Circuit Court of Appeals explained:

> In *Tatro*, the Supreme Court established a bright-line test: the services of a physician (other than for diagnostic and evaluation purposes) are subject to the medical services exclusion, but services that can be provided in the school setting by a nurse or qualified layperson are not. Regardless of whether we agree with this reading of the statute and the regulations, we are bound by the Supreme Court's holding. . . . Here Garret's services are not provided by a physician, but rather a nurse. Thus, based on *Tatro*, the services are not medical services, but rather, school health services or supportive services, both of which meet the definition of related services which the district must provide.

*Garret F.*, 106 F.3d at 825. (citations omitted).

In *Skelly*, Eddie Skelly, was a four-year old boy who suffered from a rare neurological-muscular disease known as Pelizaeus–Merzbacher Leukodystrophy ("PMD"). 968 F.Supp. at 386. As a result of PMD, Eddie received a tracheostomy tube which was not used for breathing but rather as a "pulmonary toilet." *Id.* at 386. Occasionally, the tracheostomy tube would need to be suctioned if Eddie was unable to cough up secretions. *Id.* at 389. The school district in *Skelly* argued that Eddie required "medical services" and that, therefore, the district was under no obligation to pay for the services

under the medical services exclusion in the IDEA. *Id.* at 387.

Judge Holderman of the United States District Court in the Northern District of Illinois, following *Garret F.*, found that the suctioning procedure required by Eddie did not have to be performed by a physician and thus Eddie's condition did not require excluded "medical services" within the meaning of the IDEA. *Id.* at 394–95. Judge Holderman stated:

> The suctioning of a tracheostomy tube is a common, standard maintenance procedure that need not be performed by a physician and therefore is not an excluded "medical service" under 20 U.S.C. § 1401(a)(17), even if a nurse is required to perform the procedure. Consistent with the testimony [in the record], however, it appears that Eddie's tracheostomy suctioning need not be performed by a licensed nurse but merely a properly trained individual.

*Skelly*, 968 F.Supp. at 395.

■ Relying on dicta in the Tatro decision, *see Garret F*, 106 F.3d at 825, other federal courts have held that *Tatro* stands for the proposition that a handicapped child is not entitled to health services if the allocation of the services places an "undue burden" on the particular school district. *See Neely v. Rutherford County School*, 68 F.3d 965 (6th Cir. 1995); *Detsel v. Board of Education of Auburn City School District*, 820 F.2d 587 (2d Cir.1987); *Fulginiti v. Roxbury Township Public Schools*, 921 F.Supp. 1320 (D.N.J. 1996) *affirmed* 116 F.3d 468 (3d Cir.1997); *Granite School District v. Shannon M.*, 787 F.Supp. 1020 (D.Ut.1992); *Bevin H. v. Wright*, 666 F.Supp. 71 (W.D.Pa.1987).

In *Neely*, Samantha Neely, the student/plaintiff suffered from Congenital Central Hypoventilation Syndrome which required a tracheostomy. 68 F.3d at 967. Samantha also required suctioning to insure that secretions did not block her tracheostomy. *Id.* Accordingly, Samantha needed a well trained individual to be readily accessible to her while she attended school. *Id.* The Sixth Circuit held that the services required by Samantha were inherently burdensome to the school district and excluda-

ble as medical services. *Id.* at 971–73. The Court of Appeals explained:

> The district court found the services in question to be "medical in nature." We believe the better interpretation of *Tatro* to be that a school district is not required to provide every service which is "medical in nature." The services at issue in *Tatro* could be provided by someone other than a nurse and a layperson, with minimum training, could provide it. *Tatro,* 468 U.S. at 894, 104 S.Ct. at 3378. It was, therefore, the kind of service that was not *unduly expensive or beyond the range of the school system's competence. Id.* at 892, 104 S.Ct. at 3377. We believe it is appropriate to take into account the risk involved and the liability factor of the school district inherent in providing a service of a medical nature such as is involved in this controversy.... [W]e agree that the services requested by Samantha are inherently burdensome ... The undue burden derives from the nature of the care involved ... The care requested by Samantha falls within the "medical services" exclusion of the IDEA.

*Neely,* 68 F.3d at 971, 973. (emphasis added).

In *Detsel,* Melissa Detsel had a tracheostomy and required the application of a saline solution and the suctioning of mucus. 637 F.Supp. 1022, 1023 (N.D.N.Y.1986). Melissa also required the services of a trained individual to monitor her throughout the school day. *Id.* There, the district court held that the School District was not obligated to provide the services required by Melissa. *Id.* at 1027. The district court explained:

> It is clear that the Supreme Court considered the extent and nature of the services performed in the *Tatro* decision. Unlike CIC, the services required by Melissa are extensive. This is not a simple procedure which the child may perform herself. Constant monitoring is required in order to protect Melissa's very life. The record indicates that the medical attention required by Melissa is beyond the competence of a school nurse. A specially trained individual is required. Preferably a health professional. The Supreme Court in *Tatro* reasoned that the regulations had

permissibly interpreted § 1401(17) in providing that school nursing services did not fall within the medical services exclusion. In so doing, the Court stated that Congress could well have decided to exclude costly and complicated services.... Indeed, the Court noted that "children with serious medical needs are still entitled to an education. For example, the Act specifically includes instruction in hospitals and at home within the definition of special education.'" This dictum is in line with the Court's earlier decision in [*Board of Education v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) ] wherein it held that Congress did not intend to "maximize each handicapped child's potential." [*Rowley,* 458 U.S. at 199, 102 S.Ct. at 3047, (holding that EAHCA, the predecessor to IDEA, did not require provision of a sign language interpreter for a deaf child enrolled in public school) ].

> In light of the foregoing, the court holds that the Education of the Handicapped Act (the predecessor to the IDEA) does not require the defendant school district and board of education to provide a severely physically disabled child with [constant] in-school nursing care.

*Detsel,* 637 F.Supp. at 1026–27. The Second Circuit Court of Appeals affirmed. *Detsel,* 820 F.2d at 588.

In *Fulginiti,* Carissa Fulginiti required constant monitoring while she attended school because her tracheostomy tube and air passages could become clogged with saliva and mucus. 921 F.Supp. at 1320. When necessary, a suctioning device was used to clear the blockages. *Id.* In describing Carissa's needs, the district court stated:

> To participate in and benefit from public education, Carissa requires extensive "related services:" she must receive special education and speech, physical and occupational therapy, special transportation and nurse supervision. Most significantly, the supervision of a full-time nurse or another specially trained person is required during her transportation to and from school, and while there, to monitor her tracheostomy tube and provide suctioning when necessary.... Put simply, if Carissa is to at-

tend school, someone must be with her constantly to monitor her air passage and maintain their clarity.

*Fulginiti*, 921 F.Supp. at 1321. Citing, *inter alia*, *Neely*, the district court granted summary judgment in favor of the Roxbury Township Public Schools. The district court stated:

> [T]he application of the determinative reasoning of all cases which have dealt directly with factual circumstances similar to the present controversy compels the conclusion of the court that to require the present Board to assume the responsibility amounts to an *undue burden*.

*Fulginiti*, 921 F.Supp. at 1325. (emphasis added). The district court was subsequently affirmed by the Third Circuit Court of appeals in an unpublished order. *See Fulginiti v. Roxbury Township Public Schools*, 116 F.3d 468 (3d Cir.1997) (table); *see also Granite School District v. Shannon M.*, 787 F.Supp. 1020 (D.Ut.1992) (held constant nursing/tracheostomy care required by handicapped student fell within "medical services" exclusion to the IDEA and thus, was not "supportive" service that school had to provide as a matter of federal law); *Bevin H. v. Wright*, 666 F.Supp. 71 (W.D.Pa.1987) (held that nursing services required were so varied, intensive and costly as not to be properly includable as "related services" which school district was responsible to provide to child without charge).

## ADMINISTRATIVE HEARINGS

The Level I Hearing Officer made the following findings of fact and conclusions of law:

1. J.M. is eligible for special education. His most recent IEP [Individualized Education Plan] lists Other Health Impairment as his primary disability category and Speech/Language as a secondary category. No one disputed either his eligibility or the category designations.

2. J.M. requires extensive health-related services and cannot attend school without these services. Moreover, the services he requires are extensive and complex enough that they can be performed only by a trained individual. The services also require greater attention than can be provided by a school nurse who is responsible for the needs of several other children in the school or district. Individual treatment is required.

3. J.M. was educated for approximately five years [at Maycrest School in the Lisbon Community Consolidated Grade School District]. During that time he received the services sought by the petitioner in this case. District funds provided those services at least part of the time that J.M. was enrolled in the other district. J.M. made social and educational gains in the other district. . . .

(R. at 795). Citing *Tatro*, the Level I Hearing Officer concluded that since the record established that J.M. only required the assistance of a "nurse or another qualified person" and not a physician, J.M. did not require "medical services" within the meaning of the IDEA and that, therefore, the School District was required to provide a qualified nurse for J.M. at its own expense. (R. at 797).[3]

The Level I Hearing Officer factually distinguished the instant case from *Detsel, Neely, Fulginiti, Granite*, and *Bevin H.*, since, in his view, the needs of the children in those cases were much more extensive than the needs of J.M. (R. at p. 796). Finally, the Hearing Officer stated:

> Even if the interpretation and reasoning of this hearing officer is incorrect, the services required by J.M. still qualify as "school health" services. The [Morton School District] correctly argue[s] that [it] was in no way bound to provide services because testimony demonstrated that services had been provided by [Maycrest School in the Lisbon Community Consoli-

**3.** The Level I Hearing Officer stated:
Although the language of the *Tatro* decision is primarily limited to discussion of school nursing services and CIC, my reading of the decision supports the interpretation that "medical" services require the expertise and knowledge of a physician, while "school health" services can be performed by a school nurse or other qualified person.
(R. at p. 796).

dated Grade School District]. What that testimony did, however, was demonstrate that the services provided to J.M. enabled [J.M.] to benefit from his special education program and that they did not prove to be an undue burden on the [Maycrest School District].

(R. at p. 797). Thus, the Hearing Officer concluded that even if he followed the "undue burden" analysis announced in *Detsel, Neely, Fulginiti, Granite,* and *Bevin H.,* the services that J.M. requires would not represent an undue burden and the services required by J.M. would therefore still qualify as "school health services." (R. at p. 797).

On January 23, 1997, a Level II Hearing Officer reviewed the Level I decision and determined that the decision was reasonable, well-supported by the record, and not erroneous as a matter of law. (R. at p. 27).

### DISCUSSION

In the instant case, the School District first argues that the administrative officers erred because the services required by J.M. are excluded "medical services." (Doc. # 19 at p. 3–11). The School District acknowledges the Supreme Court's holding in *Tatro,* however, the District argues that *Tatro* is readily distinguishable from the case at bar. The District reads *Tatro* to stand for the proposition that the IDEA requires school districts to provide as a related service only those limited health related functions *traditionally* performed by a *school nurse.* (Doc. # 19 at p. 6). Thus, the District maintains that *Tatro* is distinguishable because Amber Tatro only required catheterization which could be performed by a layperson, whereas J.M. requires the services of a skilled pediatric nurse, *not* a "traditional" school nurse. Specifically, the District states:

By characterizing the nursing services required to be provided as *school* nursing services, the Supreme Court used language which appears to limit the scope of the nursing services which a school must provide. Nowhere in its opinion does the *Tatro* Court discuss the impact of the statute or regulations on medical services more intense than CIC. The Court never reached or ruled on the issue of whether or not extensive medical services such as those required by J.M. are "related services" within the meaning of any applicable state or federal statute or regulation.

(Doc. # 19 at p. 6) (emphasis in original).

The Court is not persuaded. As the Court has already explained: the IDEA provides that a school district must provide, at its own expense, "related services." 20 U.S.C. § 1401(a)(17). The IDEA excludes, however, "medical services" unless these services are for diagnosis or evaluation. *Id.* The federal regulations define "related services" as, among other things, "school health services." 34 C.F.R. § 300.16(a). Section 300.16(b)(4) provides that "school health services" are those services provided by a "qualified school nurse *or other qualified person.*" (emphasis added). Finally, section 300.16(b)(4) provides that medical services are services provided by a licensed physician.

■ These federal regulations are entitled to deference if they are considered reasonable interpretations of congressional intent. *See Tatro,* 468 U.S. at 892, 104 S.Ct. at 3377 (*citing Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982)). In *Tatro,* the United States Supreme Court determined that these specific regulations were in fact reasonable interpretations. *Id.* Thus, this Court must defer to the regulations in determining whether J.M. requires "medical services" rather than "school health services." *See e.g. Blum,* 457 U.S. at 141, 102 S.Ct. at 2361.

■ In the instant action, the Court must determine whether the preponderance of the evidence supports the conclusion that J.M. requires "related services" or "medical services." *See* 20 U.S.C. § 1415(e)(2); 20 U.S.C. § 1401(a)(17). The administrative record contains a letter from J.M.'s pediatrician, Dr. Susan A. Kescskes, dated June 6, 1996. (Record "R." at 794). That letter provided:

June 6, 1996

Re: [J.M.]

To Whom it May Concern,

This letter is in reference to my patient [J.M.], who is a pupil in your school dis-

trict. [J.M.] has chronic lung disease and is ventilator dependent. [J.M.] requires [cithera] skilled pediatric nurse or one of his parents with him at all times. He will require a skilled pediatric nurse with him while he attends school.

[J.M.] is ventilator dependent, with a tracheostomy, gastrostomy, and is dependent in activities of daily living. The nurses duties would include: assessment of the respiratory status with appropriate interventions (suctioning, trach care or replacement, oxygen administration, etc), administration of medication (requires hourly eye lubricant to prevent corneal abrasions, administration of nebulized breathing treatments, etc), monitoring of equipment function with troubleshooting as indicated, and assistance with activities of daily living (feeding, toileting, and transfers). The responsibilities outlined above would require a skilled pediatric nurse that is familiar with pediatric ventilator dependent patients, is familiar with the specific equipment used (portable ventilators, metal trachs, oximeter, gastrostomy tubes, suction machine). The parents have completed an extensive training program and are qualified to provide his care needs.

[J.M.] must be accompanied to and from school with a nurse trained with his care needs and/or his mother. [J.M.] will also require an air-conditioned environment during transport and during school hours due to the nature of his chronic lung disease and reactive airway. Heat and high humidity can exacerbate his respiratory condition. . . .

(R. at p. 464).

This evidence establishes that J.M. requires a "pediatric nurse or one of his parents with him" while he attends school. (R. at p. 464). There is no evidence in the record that indicates that J.M. requires the services of a physician while he attends school. Moreover, the record establishes that J.M.'s parents, both laypersons,[4] were able to provide for J.M.'s daily needs after one week of training. (R. at p. 361—365,

4. J.M.'s father is a computer analyst for Caterpillar Inc., and J.M.'s mother is a school teacher.

464). In this way, the instant action is quite similar to *Tatro*. There, Amber Tatro's parents, both laypersons, were effectively trained to perform the CIC procedure. *Tatro*, 468 U.S. at 885, 104 S.Ct. at 3373. Here, J.M.'s parents, both laypersons, have been trained to, for example, maintain J.M.'s tracheostomy. (*See* R. at p. 365). Accordingly, the preponderance of the evidence demonstrates that J.M. requires "school health services," not "medical services" since J.M. does not require the services of a physician while he attends school. *See Tatro*, 468 U.S. at 892, 104 S.Ct. at 3377; *Garret*, 106 F.3d at 825; *Skelly*, 968 F.Supp. at 395;, 20 U.S.C. § 1401(a)(17); 34 C.F.R. § 300.16(b)(11); 34 C.F.R. § 300.16(b)(4).

The Court is fully aware that the United States Supreme Court is currently considering a petition for a writ of certiorari in *Cedar Community School District v. Garret F.*, 65 U.S.L.W. 3768 (May 8, 1997). However, this Court is not prepared to deny J.M. a "free appropriate education" on the basis that the Supreme Court *might* reverse the Eighth Circuit's holding in *Garret*.

Next, the Morton School District cites *Neely, Detsel, Fulginiti, Granite,* and *Bevin H.*, to support its argument that J.M.'s needs will unduly burden the school district. However, each of these cases relied on dicta from the *Tatro* decision. Indeed, the Eighth Circuit in *Garret* observed:

The court is aware of several decisions that have not interpreted *Tatro* as establishing a bright-line, physician/non-physician test for medical services. *See Detsel v. Board of Educ. of Auburn*, 637 F.Supp. 1022 (N.D.N.Y.1986), *aff'd* 820 F.2d 587 (2d Cir.1987)[ ]; *Granite School Dist. v. Shannon M.*, 787 F.Supp. 1020 (D.Utah 1992); *Neely v. Rutherford County School*, 68 F.3d 965 (6th Cir.1995). Going beyond the physician/non-physician distinction the Supreme Court found in the statute and the regulations, these courts rely on dicta in *Tatro* in order to factor into the medical services exclusion considerations of the nature and extent of the services performed.

(R. at p. 355–385).

The Court declines to seize dicta in *Tatro* to go beyond the physician/non-physician test which the Supreme Court sets forth therein.

*Garret F.*, 106 F.3d at 825.

■ Moreover, even if this Court were to follow *Detsel* and its progeny, such an approach would not change the result here since the record establishes that the services that J.M. requires do not necessarily represent an undue burden. That is, the record indicates that (1) J.M. attended the Maycrest School in the Lisbon Community Consolidated Grade School District from 1991 to 1996, (R. at p. 389–399), (2) the Lisbon Community Grade School District contracted with a nurse, Faith Read, to provide health services for J.M., (R. at p. 389, 773), (3) J.M. made social and educational gains while attending the Maycrest School, (R. at p. 403, 406), and that (4) the Lisbon School District provided the services of Faith Read at its own expense. (R. at p. 391). Thus, the record shows that a school district like Morton is not necessarily burdened and/or unduly burdened by a student like J.M. Indeed, the Maycrest School provided school health services for J.M. for nearly five years without incident. (Doc. # 25 at ¶ 33).

Furthermore, in reviewing the administrative record, this Court is required to give "due weight" to the results of the administrative proceedings and may not substitute its own notion of sound educational policy for that of the Illinois State Board of Education. *See Heather S.*, 125 F.3d at 1052; *see also Monticello School District v. George L.*, 102 F.3d 895 (7th Cir.1996); *Board of Educ. of Murphysboro v. Illinois State Board of Education*, 41 F.3d 1162, 1166–67 (7th Cir.1994). Here, both Hearing Officers concluded that the services required by J.M. did not represent an undue burden given the Maycrest School District's ability to provide the services for five years prior. (R. at p. 18, 19, 797). In this regard, the Level II Hearing Officer stated:

> Although the [Morton School District] would like to minimize the importance of the [Maycrest School District's] actions, the fact remains that by providing [J.M.'s] health care services for five years, the [Maycrest School District] demonstrated that it found that supplying the requested services posed neither an undue financial burden nor a challenge that was beyond the range of the educators' competence.

(R. at p. 18 n. 4). Thus, since the Court may not substitute its own judgment for that of the Illinois State Board, even if the Court were to follow *Detsel* and its progeny, the result here would be the same.

Nevertheless, the Morton School District insists that "the provision of medical care to J.M. would impose an undue burden on Morton School District." (Doc. # 19 at p. 17). Specifically, the District states:

> School districts have no expertise in the provision of medical services such as those required by J.M. In the absence of such expertise, they have no means to effectively evaluate the nature or the quality of the services provided to students such as J.M. *Consequently, the District would be susceptible to claims for malfeasance and negligence* in the event that a provider of medical care under the employment of the District erroneously or inadequately performed its obligation.

(Doc. # 19 at p. 17) (emphasis added).

■ The Court agrees that servicing the needs of disabled students like J.M. is obviously more difficult than attending to the needs of children who do not suffer from such disabilities. However, this Court cannot rewrite the IDEA. That is, the Act seeks to assure that *all* children *with disabilities* have available to them a free appropriate public education. 20 U.S.C. § 1400(c). In addition, the statute provides several types of supportive services for disabled children which are much more extensive than those *ordinarily* provided to public school students, e.g., speech pathology, audiology, psychological services, and therapeutic recreation services. 20 U.S.C. § 1401(a)(17). Thus, by its very nature, the statute imposes the very burden on school districts that Morton now seeks to avoid. Accordingly, if Morton objects to the obligations imposed by the IDEA, then it should take that grievance up with the legislature *not* the judiciary. Furthermore, the possibility that the Morton

School District might be sued based on a negligence theory *does not* persuade the Court that it should relieve the Morton School District of its legal obligation to provide the services that J.M. requires.

Next, the Morton School District argues that the administrative "officers employed an improper standard in determining whether or not J.M.'s medical services are 'necessary to aid a handicapped child to benefit from special education.'" (Doc. # 19 at p. 15–17). Here, the District maintains that there must be some proximate relationship between the services that J.M. requires and the educational programs of the Morton School District. (Doc. # 19 at p. 16) (*citing Clovis Unified School District v. Office of Administrative Hearings,* 903 F.2d 635 (9th Cir. 1990)). Specifically, the District states:

> [A] school district is required to provide only those services which are related to the educational process as determined by applicable statutes and regulations. The mere fact that the provision in the school setting of the nursing services which enable J.M. to breathe would also permit him to attend school does not mean that the Morton School District must provide such medically related services at its expense. The medical services which J.M. requires are the same whether he is in school or out of school. Those services have no special or particular relationship to the educational process. They are necessary for J.M. to attend school only in the same sense that other basic needs, such as food, clothing and shelter are similarly necessary. Both the Level I and Level II Hearing Officers essentially ignored the medical services exclusion and employed an inappropriate standard to determine whether or not the requested services are "necessary to aid a handicapped child to benefit from special education."

(Doc. # 19 at p. 16–17).

The School District's argument fails for two reasons. First, it assumes that J.M. requires "medical service" which the Court has already rejected. Second, the argument cannot be reconciled with the Supreme Court's holding in *Tatro.* There, the Supreme Court stated:

The issue in this case is whether CIC is a "related service" that [the School District] is obliged to provide Amber. We must answer two questions: first, whether CIC is a "supportive servic[e] ... required to assist a handicapped child to benefit from special education" ...

The Court of Appeals was clearly correct in holding that CIC is a "supportive servic[e] ... required to assist a handicapped child to benefit from special education." It is clear on this record that, without having CIC services available during the school day, Amber cannot attend school and thereby "benefit from special education." CIC services, therefore fall squarely within the definition of a "supportive service"

*Tatro,* 468 U.S. at 890, 104 S.Ct. at 3376.

Amber Tatro required CIC whether she was at home or at school just as J.M. requires, for example, trach care while at home or at school. The relationship between the services required by Amber and J.M. is that neither child can benefit from public education without the services. In this light, the Court finds no merit in the Morton School District's argument.

Finally, throughout the Morton School District's memorandum in support of its motion for summary judgment, the District argues under various statutes and regulations that the IDEA only requires a school district to provide the services of a *traditional* school nurse. In short, the Court disagrees for the reasons already stated. The Court notes, however, that the School District defines the duties of a school nurse as: "record keeping" and "minor emergency services for the entire student population and staff." (Doc. # 19 at p. 12). Thus, if the Court were to accept the District's argument, very few, if any, disabled children could benefit from the IDEA if they were only permitted to attend school where their disabilities could be adequately attended to by a traditional school nurse as defined by the Morton School District.

### CONCLUSION

The Court finds that the preponderance of the evidence supports the conclusion that

J.M. requires *and* is entitled to "related services" under the IDEA. Thus, the Illinois State Board decision correctly directed the Morton School District to identify and contract with a qualified individual to provide services to J.M. IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment [Doc. # 22] is **GRANTED**. IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment [Doc. # 17] is **DENIED**. IT IS FURTHER ORDERED that Defendants' Motion for Preliminary Injunction [Doc. # 14] is **DENIED** as **MOOT**. The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendant and against Plaintiff. The Clerk is further directed to **TERMINATE** this case.