**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0021n.06
Filed: January 8, 2007

**No. 06-1405**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

Tom Briggs, Personal Representative for the )
Estate of Thomas E. Briggs, )
             )
      Plaintiff-Appellant, )
             )
v. )  ON APPEAL FROM THE UNITED
             )  STATES DISTRICT COURT FOR THE
Oakland County; Oakland County Sheriff's )  EASTERN DISTRICT OF MICHIGAN
Department; Deputy Szydlowski; Deputy )
Vasquez; Sandy Stetz, RN; Debbie Tipton, )
RN; and Connie Zamora, RN, )
             )
      Defendants-Appellees. )

Before:  CLAY, ROGERS, and SUTTON, Circuit Judges.

**ROGERS, Circuit Judge.**  On June 13, 2004, Thomas E. Briggs, a pretrial detainee, fell from a bunk in his cell.  Nurses responded by taking Briggs's vital signs, checking Briggs's inmate intake file, asking Briggs questions about his medical history and injuries, giving Briggs medicine, and placing Briggs in an observation cell.  After approximately twenty minutes in the observation cell, nurses discovered Briggs lying dead on the floor.  Briggs died of internal bleeding resulting from broken ribs that lacerated his spleen.

Plaintiff Tom Briggs, personal representative for the estate of Thomas E. Briggs, brought a § 1983 action against Oakland County, the Oakland County Sheriff's Department, and deputies and

nurses whom the Sheriff's Department employed, claiming that these defendants were deliberately indifferent to the health of Briggs. The district court granted defendants' motion for summary judgment.

We affirm the district court's order granting defendants' summary judgment motion. The district court correctly concluded that no rational juror could find that any of the nurses or deputies was subjectively aware of a substantial risk of harm to Briggs's health. Summary judgment was also appropriate for the County and Sheriff's Department (collectively, "municipal defendants") because plaintiff did not present any evidence showing how the municipal defendants' alleged failure to train their employees established deliberate indifference to the health or safety of pretrial detainees.

**Background**

The tragic events of this case took place on June 13, 2004, at the Oakland County Sheriff's Department, where Thomas E. Briggs was a pretrial detainee being held on assault charges. Briggs had been in the jail for approximately one week. During this time, he experienced symptoms of heroin withdrawal.

*Fall from Bunk*

At approximately 10:40 p.m., Supervisor Jeffrey Devita, Deputy Richard Hubble, and Deputy Jeffrey Jones heard banging on the bars of the cell holding Briggs and other inmates. Hubble and Jones walked from the supervisor's office to investigate the banging. When Hubble arrived at the

cell, he observed Briggs lying on the floor and was told by other inmates in the cell that Briggs had suffered a seizure. Deputy Hubble relayed this information to Supervisor Devita, who then walked to the cell and observed Briggs lying on the floor. Deputy Jones radioed for a nurse to come to the cell after he "heard there was a disturbance down there of a medical nature." Deputy Theodore Rhyndress, Jr. also heard the banging, went to the cell to investigate, and heard other inmates in the cell say that someone had fallen from the top bunk and was having a seizure. Supervisor Devita stated that he found Briggs lying motionless on his left side, but that he did not observe any "seizure-like activity" on the part of Briggs. Deputy Rhyndress observed Briggs "on his knees in a ball position."

Deputy Hubble moved the other inmates from the cell into the vestibule (i.e., another cell). Once the other inmates were locked in the vestibule and Briggs was alone in the cell, Supervisor Devita and Deputy Hubble walked into the cell. Devita stated that he first checked Briggs's wrist band to identify him and then asked Briggs to tell him what had happened. According to Supervisor Devita, Briggs said that he had fallen out of his bunk, and when asked, denied that he had suffered a seizure, that he had ever suffered from seizures, or that he was suffering from withdrawal from drugs. Devita also stated that when he asked Briggs where he was hurt, Briggs pointed to his "left side by like his rib area." Deputy Hubble stated that when he entered the cell, he saw Briggs lying on the floor and Briggs said that his side hurt and pointed to his left side.

Deputy Rhyndress stated that he instructed Briggs to remain on the floor and asked Briggs whether he was hurt, and that Briggs responded by pointing to his side. Rhyndress then looked under

Briggs's shirt and saw that his skin had a "slight discoloration . . . [l]ike gray, just a tint." Supervisor Devita stated that he did not "see any apparent injury, nothing abnormal." Rhyndress said that he pointed out the discoloration to the nurses who came into the cell.

*Response by Nurses*

At approximately 10:45 p.m., a deputy notified Sandy Stetz and Connie Zamora, nurses for the Sheriff's Department, that a nurse was needed for a "possible seizure." Nurses Stetz and Zamora grabbed a stethoscope, blood pressure cuff, and gloves, and headed to Briggs's cell.

Nurse Zamora stated that when she arrived at the cell, she saw Briggs lying face-down on the floor and moaning. Supervisor Devita told Nurses Stetz and Zamora that inmates had told him that Briggs fell off his bunk and the inmates thought that Briggs was having a seizure. Devita also told Stetz and Zamora what Briggs had told him—that he had fallen out of his bunk, his left side was hurting, and that he had not had a seizure and was not suffering from withdrawal. Nurse Zamora stated that she heard another inmate say that Briggs had fallen from the top bunk and hit his head on a table.

Nurse Zamora stated that when she entered the cell, she "immediately went over to [Briggs and] tried to get a pulse." Zamora said that it was difficult for her to take Briggs's pulse because he was moving his arm.[1] At this point, Briggs asked Supervisor Devita whether he could use the

---

[1]Deputy Rhyndress observed Nurses Zamora and Stetz visually examine Briggs and attempt to take Briggs's blood pressure. Rhyndress stated that he thinks the nurses lifted Briggs's shirt to

bathroom. Devita stated that he asked Briggs whether he could "get there" and Briggs replied that he could. Deputy Rhyndress stated that Briggs moved to the bathroom by "doing a shuffle across the floor" on his hands and feet in "[k]ind of like a crawling, running position."

According to Deputy Rhyndress, Briggs "temporarily" appeared to have trouble breathing; Rhyndress stated that Briggs took many short breaths and that Briggs said that he was having "a hard time catching his breath." Supervisor Devita also noted that Briggs was complaining that his "ribs hurt and he couldn't catch his breath."

After Briggs used the bathroom (Nurse Zamora stated that Briggs told her that he had diarrhea), Devita saw Briggs walk to the sink and wash his hands. Devita stated that Briggs walked slowly, but was not "bent over or hunched over," was not favoring his left side, and did not appear to have any difficulty breathing.

After using the bathroom and washing his hands, Briggs walked over to a wheelchair that a deputy had brought into the cell, and sat down. Supervisor Devita stated that Briggs walked slowly to the wheelchair, but that Briggs did not appear to be in pain. The nurses and the deputy who brought the wheelchair then wheeled Briggs to the clinic.

*Treatment at Clinic*

---

inspect the area of Briggs's skin that was discolored, but he was not sure. Supervisor Devita heard the nurses ask Briggs whether "he was okay and what had happened."

Nurses Stetz and Zamora left the cell and returned to the nurses' station in the clinic located in the K block. According to Nurse Stetz's report, she and Nurse Zamora discussed Briggs's condition and concluded that Briggs did not fall from the top bunk because there were no marks on his body that would indicate that he fell. At the nurses' station, Stetz checked Briggs's booking information and discovered that, according to the booking information, Briggs was going through heroin withdrawal. At approximately 10:55 p.m., Briggs was brought to the clinic. Nurse Zamora stated that when Briggs first arrived, she asked him what had happened and attempted to get his vital signs, but that Briggs did not answer and instead said that he had to go to the bathroom. After using the bathroom, Briggs walked back to the wheelchair and sat down. Nurse Zamora then measured Briggs's blood pressure and pulse, which she recorded in her written report to be 130/74 and 88, respectively. Nurse Zamora also stated that she "observed" Briggs by visually checking his head and face for abrasions and noted that he was not having trouble breathing. Zamora then asked Briggs about his diarrhea and whether he had been going through heroin withdrawal. According to Zamora, Briggs "said that he had already been through withdrawals but he started having diarrhea again that day."

After Nurse Zamora took Briggs's vital signs, Briggs said that he had to use the bathroom again and "jumped out of the wheelchair and . . . ran over to cell three to use the toilet." Nurse Deborah Tipton stated that she observed Briggs walking to the bathroom and that he was not walking slowly, was not favoring his left side, and was not making any sounds. While Briggs was in the bathroom, Zamora brought Mintox and Kaopectate, medicines given to patients suffering from

withdrawal and diarrhea, over to the cell where Briggs was using the bathroom. Nurse Zamora

stated that she waited for Briggs to finish using the bathroom, and then gave him the medicine. After

Briggs drank the medicine, a deputy locked Briggs in the cell and Nurse Zamora returned to the

nurses' station to complete paperwork. This occurred at approximately 11:05 p.m.

*Observation at Clinic*

After Nurse Zamora left Briggs alone, Deputy David Szydlowski observed Briggs either

sitting or standing inside his cell and stated that Briggs did not appear to be in any pain or

discomfort. Deputy Szydlowski also remembered Briggs "making noise" and asked Nurse Tipton

about Briggs. According to Szydlowski, Nurse Tipton said that she did not know anything about

Briggs because she had just begun her shift.[2] In addition, Deputy Benito Vasquez observed Briggs

lying on a cement partition inside his cell and heard Briggs moan once.

Deputy Hubble stated that one of the nurses told him that Briggs was being given medicine

to settle his stomach and would be returned to his cell. Hubble stated that the nurse told him that

Briggs would be restricted from sleeping on the top bunk. Deputy Hubble stated that during this

conversation, he saw Briggs standing and beating on the window to the cell door. Hubble stated that

Briggs said "Fuck you, Hubble. You can't keep me here. I want to go back to my cell and watch

---

[2]Deputy Szydlowski also said that later, while making his rounds, he saw Briggs kneeling in his cell, and Briggs did not look to be in any discomfort, was not making any noise, and simply showed Szydlowski his identification wrist band. Afterwards, Deputy Szydlowski went to the C-block to find out why Briggs was in the clinic, but did not find out any answers.

the basketball game."[3]  However, Deputy Hubble also explained that he did not include this incident in the report he wrote on June 13, 2004.

Supervisor Devita also visited the clinic and asked either Nurse Stetz or Zamora whether Briggs "was going to be okay."  According to Devita, the nurse said that Briggs had diarrhea and received medicine for it.  Devita also stated that at this time, he saw Briggs using the bathroom, and Briggs did not appear to be in pain.

Nurse Zamora stated that she looked into Briggs's cell sometime between 11:15 p.m. and 11:20 p.m. and saw Briggs, who was lying on his back, turn over onto his side.  Zamora also stated that she remembered hearing Briggs later yelling from his cell.  Nurse Tipton stated that she heard Briggs pounding on the door to his cell and yelling, "you can't do this, let me out of here."  Nurse Zamora stated that Nurse Tipton came to the nurses' station and told Zamora that Briggs was standing at the door of his K-block cell and yelling that he wanted to go back to his C-block cell.

*Death of Briggs*

A few minutes later,[4] Nurses Zamora, Stetz, and Tipton went to check on Briggs and saw

---

[3]The basketball game Briggs referred to was presumably Game 4 of the 2004 NBA Finals between the Detroit Pistons and the Los Angeles Lakers, a game that other inmates were watching in the C-block.

[4]Nurse Tipton stated that the nurses checked on Briggs "no more than four minutes" after Briggs's pounding and yelling stopped.  Nurse Zamora's report indicates that they checked on Briggs at 11:25 p.m.

through the window to the cell that Briggs was lying on the floor and not moving. The nurses called for deputies to open the door, and, after Deputy Szydlowski opened the door, the nurses went inside the cell and found Briggs lying on his back surrounded by pink vomit. Nurse Zamora checked for a pulse, but could not find one. Nurse Zamora told deputies to call 911. Nurse Zamora and Deputy Vasquez moved Briggs to an area just outside the cell, and Nurse Zamora turned Briggs on his side. Zamora stayed with Briggs while Nurse Tipton retrieved a portable defibrillator and Nurse Stetz retrieved oxygen, towels, and an ambu bag, "a device that artificially pumps air into the lungs," *Neely v. Rutherford County Sch.*, 68 F.3d 965, 967 (6th Cir. 1995). Zamora checked again for a pulse and, when she did not find one, began giving Briggs breaths with the ambu bag. Nurse Zamora continued CPR until the paramedics arrived less than ten minutes later.

Briggs was unable to be revived. Briggs died of complications from his fall in his cell—that is, the fall broke his ribs which lacerated his spleen, causing internal bleeding.

*Procedural History*

On September 3, 2004, plaintiff filed a civil rights action under 42 U.S.C. § 1983 against Oakland County, the Oakland County Sheriff's Department, and several law enforcement officers and nurses who were Oakland County employees—Supervisor Devita; Deputies Hubble, Jones, Rhyndress, Szydlowski, and Vasquez; Nurses Zamora, Stetz, and Tipton; and Sergeant Clark, a supervisor in the Sheriff's Department—alleging that each violated Briggs's Fourth, Eighth, and Fourteenth Amendment rights. Plaintiff also brought a state law claim of "Gross Negligence,

Intentional, Willful, Reckless, and Wanton Misconduct on the Part of All Defendants Pursuant to [Michigan Compiled Laws §] 691.1407," a claim that the district court dismissed without prejudice after declining to exercise supplemental jurisdiction. Defendants moved for summary judgment on plaintiff's § 1983 claims.

The district court granted defendants' motion for summary judgment. The court held that plaintiff could not succeed in his claim of deliberate indifference because "there is no evidence that any of the individual [d]efendants knew of and disregarded an excessive risk to Briggs' health or safety." *Briggs ex rel. Estate of Briggs v. Oakland County*, No. 04-73458, 2005 WL 3320868, at *5 (E.D. Mich. Dec. 7, 2005). Consequently, the court granted summary judgment to Oakland County and the Oakland County Sheriff's Department because a "'municipal defendant cannot be held liable under § 1983 when the plaintiff has failed to establish a constitutional violation by the individual defendants.'" *Id.* (quoting *Crocker v. County of McComb*, 285 F. Supp. 2d 977 (E.D. Mich. 2003)).

Following the district court's decision, plaintiff filed a Motion to Amend and a Motion for Reconsideration. The district court granted plaintiff's Motion to Amend and thus permitted plaintiff to supplement the record with the depositions of Nurse Stetz and two experts. The district court denied plaintiff's Motion for Reconsideration because the "new deposition testimony does not create a material question of fact and [the Motion] merely presents the same issues that" the court decided in its order granting summary judgment to defendants. *Briggs v. Oakland County*, No. 04-73458, 2006 WL 156681, at *1 (E.D. Mich. Jan. 20, 2006).

Plaintiff filed a notice of appeal from the district court's order denying plaintiff's Motion for Reconsideration. In his Motion for Reconsideration, plaintiff stated that he "has no quarrel with the dismissal of Devita, Clark, Hubble, Rhyndress and Jones." Plaintiff only purports to appeal the district court's order denying his Motion for Reconsideration, and plaintiff's brief on appeal does not challenge the dismissal of these defendants. Plaintiff has thus waived any challenge to the district court's decision in favor of Devita, Clark, Hubble, Rhyndress, and Jones.

**Standard of Review**

This court reviews the district court's order granting summary judgment *de novo*. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001). A district court may grant a motion for summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Proc. 56(c). Summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This court draws all "justifiable inferences" in Briggs's favor. *See id.* at 255.

**Discussion**

1. **Individual Defendants**

Summary judgment is appropriate here because plaintiff cannot show that Deputies

Szydlowski or Vasquez, or Nurses Zamora, Stetz, or Tipton (collectively, "individual defendants")

were deliberately indifferent to Briggs's health or welfare. To establish a cause of action under §

1983 for deliberate indifference to a pretrial detainee's health, plaintiff must show both (1) "that

[Briggs was] incarcerated under conditions posing a substantial risk of serious harm," *Farmer v.*

*Brennan*, 511 U.S. 825, 834 (1994), and (2) that an individual defendant "knew of and disregarded

a substantial risk of serious harm to [Briggs's] health and safety," *Watkins*, 273 F.3d at 686 (citing

*Farmer*, 511 U.S. at 835-37). With respect to the second requirement, defendants "must both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,

and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Assuming that Briggs was incarcerated under conditions posing a substantial risk of serious

harm, plaintiff does not show that any of the individual defendants knew of and disregarded a

substantial risk of serious harm to Briggs's health or safety. Here, there is no direct evidence that

any of the individual defendants subjectively knew of a substantial risk of serious harm to Briggs's

health or safety. Plaintiff does not argue otherwise, but insists instead that he can defeat summary

judgment "by demonstrating that the defendants had a sufficiently culpable state of mind 'based on

a strong showing of the objective component.'" Plaintiff's Br. at 21 (quoting *Estate of Carter v. City*

*of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005)). Plaintiff is correct that he may also state a claim for

deliberate indifference by showing that objective evidence of an excessive risk to the health or safety

of an inmate was so obvious and extreme that a rational juror could infer that a defendant

subjectively knew of that risk. *Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite

knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." (citation omitted)); *Estate of Carter*, 408 F.3d at 313 ("In most cases in which the defendant is alleged to have failed to provide treatment, there is no testimony about what inferences the defendant in fact drew.  Nonetheless, in those cases, a genuine issue of material fact as to deliberate indifference can be based on a strong showing on the objective component.").  However, plaintiff has not succeeded in doing so here.

a.      *Deputies Szydlowski and Vasquez*

The evidence does not permit a rational juror to infer that either Deputy Szydlowski or Deputy Vasquez knew of and disregarded a substantial risk to Briggs's health or safety.  The evidence shows only that they heard Briggs "making noise" or moaning, and did not respond.  This is insufficient proof of deliberate indifference because one cannot draw an inference that there was a substantial risk of harm to Briggs just because he was moaning inside of a medical ward.

Plaintiff attempts to show that Deputies Szydlowski and Vasquez are liable by presenting deposition testimony of a "jail procedures expert" who "was highly critical" of the deputies for failing to check on Briggs or notify a nurse after they heard Briggs moan, even though the deputies' jobs were to "monitor inmates for safety."  Perhaps Szydlowski and Vasquez should have acted differently; however, it does not necessarily amount to deliberate indifference for a defendant to fail to perceive a risk of harm that he should have perceived.  *Farmer*, 511 U.S. at 838 ("[A]n official's

failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."); *Watkins*, 273 F.3d at 686 ("If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendments."). Therefore, there is not sufficient evidence that Deputies Szydlowski and Vasquez were deliberately indifferent to the health or safety of Briggs.

> b.      *Nurses Zamora, Stetz, and Tipton*

The evidence also does not permit a rational juror to infer that either Nurse Zamora, Nurse Stetz, or Nurse Tipton knew of and disregarded a substantial risk of serious harm to Briggs's health or safety. Nurse Zamora took Briggs's vital signs, which were normal, checked to see whether Briggs was having difficulty breathing, and did not observe Briggs standing or walking with difficulty. Nurse Zamora asked Briggs about his diarrhea and, after checking Briggs's medical file, concluded (perhaps erroneously) that he was suffering from heroin withdrawal. Although Briggs pointed to his left side when Supervisor Devita asked where Briggs hurt, and Devita told this to Nurses Stetz and Zamora, this information combined with the other observations upon which Nurse Zamora based her treatment decisions is insufficient to permit a rational juror to conclude that Nurse Zamora subjectively believed that there was a substantial risk of harm to Briggs's health. At most, Nurse Zamora perceived a lesser risk of serious harm to Briggs's health and acted under that belief by giving Briggs medicine and placing him under observation. This is consistent with Nurse Zamora's belief (as discussed in Nurse Stetz's report) that Briggs did not fall from the top bunk at

all. Again, plaintiff argues that Nurse Zamora should have acted differently, but as the Supreme Court has emphasized, "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also id.* at 105-06 ("[I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." (quotations omitted)).

Similarly, Nurses Stetz and Tipton were not deliberately indifferent to Briggs's health or safety. Plaintiff does not direct this court to any information that Nurses Stetz or Tipton had which Nurse Zamora did not have. To the extent that Nurses Stetz and Tipton treated Briggs alongside Nurse Zamora, they are not liable for the reasons stated above with respect to Nurse Zamora. To the extent Nurses Stetz and Tipton did not participate in Briggs's treatment, they are not liable because they knew that Nurse Zamora was treating Briggs. *See Clark-Murphy v. Foreback*, 439 F.3d 280, 287 (6th Cir. 2006) (concluding that officers who had no reason to think that other officers to whom they gave information about an inmate were not treating that inmate were not liable for deliberate indifference to the inmate's health or safety).

## 2. Municipal Defendants

The district court correctly granted summary judgment to Oakland County and the Oakland

County Sheriff's Department. A municipality's failure to train its employees constitutes a § 1983 violation "where the failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). This court explained that "[t]o succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

Although plaintiff states that this single incident demonstrates that "the municipal [d]efendants have a policy of prisoner neglect," plaintiff does not explain how the municipal defendants' purported failure to train their employees constitutes deliberate indifference to the rights of pretrial detainees. Instead, plaintiff merely suggests a number of policies that the municipal defendants should have adopted.[5] Plaintiff stops short of showing that "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. In *City of Canton*, the Supreme Court noted that it will not

---

[5]Plaintiff suggests the following policies: a policy for monitoring of patients by deputies and nurses; a policy for dealing with trauma; "post assignments" for deputies working in the clinic area; a requirement that deputies keep a "log describing their observations"; a policy for deputies on "how to respond to or monitor particular issues"; a policy "that directed these officers to know what to look for or how often to look."

suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.

*Id.* at 391; *see also Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998) ("Allegations that a particular officer was improperly trained are insufficient to prove liability, as are claims that a particular injury could have been avoided with better training"). Therefore, the district court was correct to grant summary judgment for the municipal defendants.

## Conclusion

For the foregoing reasons, we AFFIRM the district court's order granting summary judgment to defendants.